2001-NMCA-043

28 P.3d 1104

**CAMPOS DE SUENOS, LTD., a New Mexico limited partnership, Plaintiff–Appellee,**

v.

**COUNTY OF BERNALILLO, Steve D. Gallegos, Les Houston, Tim Kline, Tom Rutherford, Ken Sanchez, Barbara Seward, Albert "Al" Valdez, and Juan R. Vigil, Defendants–Appellants.**

No. 20,918.

Court of Appeals of New Mexico.

April 18, 2001.

Certiorari Denied, No. 26,934, June 28, 2001.

Stephen P. Curtis, Stephen P. Curtis Attorney At Law, P.C., Albuquerque, NM, for Appellee.

Tito D. Chavez, Bernalillo County Attorney, H. Nicole Schamban, Narvaez Law Firm, P.A., Albuquerque, NM, for Appellants.

Al Valdez, Albuquerque, NM, Pro Se.

## OPINION

BOSSON, Chief Judge.

{1} This appeal addresses whether a contract implied in fact can satisfy the requirement of a "valid written contract" such that it overcomes governmental immunity from suit under NMSA 1978, § 37-1-23(A) (1976). The question is posed in the context of a commercial sale of a privately-owned sports facility to the County of Bernalillo; a sale that fell through before the parties reached agreement on an express written contract. We are asked to expand the analytical framework of *Garcia v. Middle Rio Grande Conservancy District,* 1996-NMSC-029, 121 N.M. 728, 918 P.2d 7, outside of the employment context, and we decline to do so. We hold there was no "valid written contract" as required under Section 37-1-23(A), and therefore the County is immune from suit for breach of contract. The district court having decided that the County was not immune from suit, we reverse.

## BACKGROUND

{2} Campos de Suenos (CDS) leased a thirty-seven acre lot on the mesa just outside of Albuquerque's west city limits on which it constructed a softball and baseball park. After the park opened, CDS proposed to sell the ballpark to Bernalillo County. The proposal included the improvements CDS had constructed as well as the underlying real estate. CDS could offer the real estate for sale because its lease contained an option to purchase from the owner, Westland Development Corporation. The County subjected the proposal to a feasibility study.

{3} At a public meeting held on December 4, 1996, the Bernalillo County Commission weighed various options regarding the CDS proposal, including whether to purchase, how much land to purchase beyond the ballpark, the possible addition of amenities and improvements, and most importantly, whether to issue project revenue bonds and how to pay for them. Ultimately, the Commission voted 3-2 in favor of an option that included purchasing the improvements and the land they were on, plus an additional sixty-three acres of land owned by Westland that surrounded the ballpark. For two months after the December 4, 1996, meeting, CDS and the County attempted to negotiate a proposed sales agreement for the ballpark, but the parties could never agree to the terms of sale. No written contract for the sale of the ballpark was ever executed by the parties. For reasons not disclosed by the record, the County never issued bonds or otherwise secured financing to purchase the ballpark. Eventually, the County decided not to purchase and, in May 1997, informed CDS in writing of that decision.

{4} After the December 4, 1996, vote, CDS thought it had an enforceable understanding

that the County would buy the ballpark, and therefore CDS did not aggressively market its fields for the upcoming summer softball season. When the County informed CDS that funding would not be forthcoming, effectively cancelling its proposed purchase, CDS found its financial position severely compromised. Fewer teams had contracted with CDS to use the fields for the 1997 summer season. The decreased revenue was inadequate to meet its lease payments to Westland, causing CDS to default. When Westland informed CDS that it intended to take over the ballfields as a result of the default, CDS filed suit against Bernalillo County for breach of contract. CDS sought $277,500 in damages for its diminished earnings for the 1997 softball season, plus $1,650,000 for the value of the improvements that it had built and then lost to Westland.

{5} CDS also alleged that over the course of constructing and operating its facility, CDS had adhered to all of Bernalillo County's zoning regulations, which cost $204,500. According to CDS, Bernalillo County had relaxed its zoning standards for the only other privately-owned ballpark, Albuquerque Sportsplex (Sportsplex), due to political favoritism. CDS included a claim in its lawsuit against individual commissioners alleging that the disparate enforcement of zoning regulations constituted illegal discrimination.

{6} On a motion for summary judgment, the County argued (1) it was immune from suit for breach of an unwritten contract pursuant to Section 37–1–23(A), and (2) that individual commissioners had qualified immunity from the suit for discrimination under 42 U.S.C. § 1983. The district court rejected both claims.

{7} As for the first claim, the district court reasoned that Section 37–1–23(A) "is in the nature of an extension of the statute of frauds." Just as courts have created exceptions to the statute of frauds, the district court concluded that exceptions to the statutory requirement of a valid written contract could be made under *Garcia,* 1996–NMSC–029, ¶ 20, 121 N.M. 728, 918 P.2d 7 (holding that a personnel manual created an enforceable written contract), as long as the policy rationale for the statute was upheld. Viewed in this manner, the district court determined that the County had voted to purchase the

ballpark on December 4, 1996, and that the various public documents, including the minutes of the December 4, 1996, meeting, placed the case "within the 'implied contract' exception of *Garcia*" because no harm was done to the policy of Section 37–1–23(A) as articulated in *Garcia.* On the second claim, the district court found that the commissioners violated a constitutional right that was clearly established at the time.

{8} The County and its individual commissioners (Defendants) timely filed an interlocutory appeal addressing the questions of governmental and qualified immunity, which we granted, treating it as a writ of error. *See Handmaker v. Henney,* 1999–NMSC–043, ¶¶ 9–14, 128 N.M. 328, 992 P.2d 879. We conclude that Defendants were entitled to both governmental and qualified immunity. Therefore, we reverse and remand with instructions to enter summary judgment in favor of Defendants.

**DISCUSSION**

■■■ {9} Appeals from a summary denial of immunity from suit are subjected to a review process that is more complex than a review of ordinary summary judgment decisions. The complexity arises, in part, because a party losing its immunity from suit in an adverse summary judgment decision may file a writ of error seeking immediate review of that decision in order to protect its right not to stand trial. *Id.* However, as *Handmaker* makes clear, not every challenge to a denial of immunity is appropriate for immediate, collateral review because some assertions of immunity are inseparable from the merits of the case. *Id.* ¶ 16. *Handmaker* counsels us to limit review by writ of error to immunity matters in " 'cases presenting more abstract issues of law.' " *Id.* (quoting *Johnson v. Jones,* 515 U.S. 304, 317, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)).

■■■ {10} Once the decision has been made to review a summary denial of immunity, we resolve evidentiary issues as we do in any summary judgment case, that is, "in the light most favorable to the party opposing the motion." *Carrillo v. Rostro,* 114 N.M. 607, 615, 845 P.2d 130, 138 (1992). However, after we have resolved the evidence in the opposing party's favor, we then examine that

evidence to determine whether the opposing party has presented sufficient evidence to overcome an assertion of immunity from suit. *Id.* This latter determination, the application of the facts of a case to an assertion of immunity, is a legal question that we review de novo. *Ponder v. State Farm Mut. Auto. Ins. Co.,* 2000–NMSC–033, ¶ 7, 129 N.M. 698, 12 P.3d 960 ("We review de novo the trial court's application of the law to the facts in arriving at its legal conclusions."). There is little dispute here concerning the material facts of this case, and therefore we turn to the legal issues.

### Section 37–1–23(A) Is an Immunity Statute, Not a Statute of Frauds

{11} The County asserts that unless CDS can produce a "valid written contract," the County is immune from suit for breach of contract. The County relies on Section 37–1–23(A), and insists that the plain language of the statute controls the issue. Under Section 37–1–23(A), "[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract."

{12} CDS contends that Section 37–1–23(A), like the statute of frauds, can be satisfied by partial writings that do not meet the standards of a completely executed contract, as long as the writings evidence a contractual agreement and satisfy the anti-fraud purpose of the statute of frauds. Essentially, CDS maintains that we should view Section 37–1–23(A) as a statute of frauds for governmental entities and read into it traditional exceptions that apply to the statute of frauds.

{13} Although requiring a "valid written contract" does prevent fraud, that condition serves a distinctly different purpose. As our Supreme Court has previously stated, the legislature wrote Section 37–1–23(A) "to reinstate sovereign immunity" in the wake of *Hicks v. State,* 88 N.M. 588, 544 P.2d 1153 (1975), the opinion that abolished common-law sovereign immunity. *Hydro Conduit Corp. v. Kemble,* 110 N.M. 173, 177–79, 793 P.2d 855, 859–61 (1990) (outlining the legislative history of the statute). The purpose of Section 37–1–23(A) was to grant governmental entities complete immunity from actions sounding in contract. However, the legislature created the one condition that makes a lawsuit permissible: when it is based on a "valid written contract." Section 37–1–23(A).

{14} The significance of that condition requires us to consider the policy behind statutory immunity from suit. The overarching policy for the legislative grant of immunity is to "protect the public purse," by requiring that "parties seeking recovery from the state for benefits conferred on it have 'valid written contracts.'" *Hydro Conduit Corp.,* 110 N.M. at 179, 793 P.2d at 861. By limiting lawsuits to valid written contracts, the legislature placed the risk of loss on a party who transacts business with a governmental entity without a valid written contract. *Id.* at 179–80, 793 P.2d at 861–62. As part of that risk of loss, the statute not only bars a party from recovering on an unwritten contract, it also relieves the governmental entity from the "burdens of a trial on the merits" by declaring the entity immune from suit. *Handmaker,* 1999–NMSC–043, ¶ 14, 128 N.M. 328, 992 P.2d 879; *see also Eaton, Martinez & Hart, P.C. v. Univ. of N.M. Hosp.,* 1997 NMSC 015, ¶ 9, 123 N.M. 76, 934 P.2d 270.

{15} The distinction between immunity from suit, which Section 37–1–23(A) provides, and a mere defense to liability, as with the statute of frauds, also informs our decision today. *See Handmaker,* 1999 NMSC 043, ¶ 14, 128 N.M. 328, 992 P.2d 879 (distinguishing between immunity from suit and immunity from liability). We issue writs of error to review immunity from suit cases because we consider them "collateral order[s] affecting interests that would be irretrievably lost if the case proceeded to trial." *Id.* ¶ 15. If we were to make a governmental entity wait until a final order on the merits before appealing an immunity decision, we would deny its "entitlement . . . not to stand trial or face the other burdens of litigation for actions based on unwritten contracts." *Id.* ¶ 14.

{16} We do not accord the same procedural primacy to claims under the statute of frauds. The statute of frauds, being in the nature of an affirmative defense to liability, is ordinarily reviewed after an appeal from a decision on the merits. *See Allen v.*

*Bd. of Educ.,* 106 N.M. 673, 675, 748 P.2d 516, 518 (Ct.App.1987) (stating that "a mere defense to liability" does not meet the requirements for immediate appellate review under the collateral order doctrine). The statute of frauds makes no pretense of being an immunity from suit; it is only a defense that the defendant must plead and prove at trial. *See Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 24, 766 P.2d 280, 284 (1988). As with other affirmative defenses, a court considering a statute of frauds defense at the summary judgment stage resolves facts in favor of the non-movant and views the evidence "in a light most favorable to a trial on the merits." *Garcia–Montoya v. State Treasurer's Office,* 2001–NMSC–003, ¶ 7, 130 N.M. 25, 16 P.3d 1084. When considering immunity from suit, on the other hand, a court must ensure that a plaintiff has affirmatively overcome the assertion of immunity. *See Carrillo,* 114 N.M. at 615, 845 P.2d at 138; *Williams v. Bd. of County Comm'rs,* 1998–NMCA–090, ¶ 24, 125 N.M. 445, 963 P.2d 522 (placing burden on plaintiff to prove immunity from suit was overcome); *see also Handmaker,* 1999 NMSC 043, ¶ 17, 128 N.M. 328, 992 P.2d 879 (concluding that plaintiff met the burden by producing "written employment contracts").

{17} Our immediate review of immunity claims by writ of error is usually reserved for discrete legal issues that do not depend on extensive factual analysis for their resolution. *Handmaker,* 1999–NMSC–043, ¶ 16, 128 N.M. 328, 992 P.2d 879. If we were to incorporate the statute of frauds and all its exceptions into Section 37–1–23(A), we would risk undermining this limitation on writ-of-error review and confuse the differences between a collateral order and a final judgment on the merits. The present conflict is a case in point.

{18} CDS offers a slew of partial writings as evidence of its contract with the County. To consider those writings in proper context, the district court had to examine all of the evidence before it to reach the conclusion that, in toto, an implied contract existed. Allowing CDS to cobble together a contract in such a manner undermines the purpose of having a comprehensive document, "a valid written contract," that defeats governmental immunity. Arguably, review

of such implied contracts is so fact-intensive that it pushes the limits of the collateral order doctrine. *See Handmaker,* 1999–NMSC–043, ¶ 20, 128 N.M. 328, 992 P.2d 879. However, immunity from suit is not waived simply because the plaintiff pleads a case that requires a court to take a step in the direction of deciding the merits of the underlying claim within the question of immunity. *See Johnson,* 515 U.S. at 313–18, 115 S.Ct. 2151 (pointing out that, for the purpose of immediate appellate review, there is a difference between deciding issues of law and deciding the existence of genuine issues of fact, and holding that the latter does not warrant immediate review). The question here addresses immunity from suit, an issue that is separate from plaintiff's breach of contract claim.

{19} For all of these reasons, and especially in light of the legislative purpose to reassert sovereign immunity over suits based on unwritten contracts, we hold that Section 37–1–23(A) is an immunity statute, not a statute of frauds. Accordingly, we reject the proposition that evidence of partial writings sufficient to satisfy the common-law statute of frauds would constitute compliance with Section 37–1–23(A). *Cf. Jennings v. Ruidoso Racing Ass'n,* 79 N.M. 144, 146, 441 P.2d 42, 44 (1968) ("It must be remembered that the memorandum, sufficient to satisfy the statute of frauds, need not in itself amount to a contract."); *Pitek v. McGuire,* 51 N.M. 364, 373, 184 P.2d 647, 653 (1947) (holding that the statute of frauds can be satisfied by writings that "need not in themselves amount to a contract or be addressed to the other party"). Indeed, after *Hicks* not much, if anything, remains of the common law in regard to sovereign immunity. *See Hydro Conduit Corp.,* 110 N.M. at 177 n. 2, 793 P.2d at 859 n. 2. We should be especially wary of relying on a common law doctrine to interpret what is now a matter of legislative will. *See Torrance County Mental Health Program, Inc. v. N.M. Health & Env't Dep't,* 113 N.M. 593, 596–601, 830 P.2d 145, 148–53 (1992) (refusing to adopt punitive damages in contract actions, despite Section 37–1–23(A)'s silence on the issue, given the legislative declaration that such damages are not available in tort).

### CDS Cannot Affect the Immunity Granted by Section 37–1–23(A)

{20} CDS and the County never entered into an express written contract for the sale of the ballpark. Neither did the parties ever execute a formal agreement in principle. The December 4, 1996, commission hearing and vote left many of the major elements of the proposed purchase unresolved. Indeed, CDS and the County continued to negotiate during the months following that meeting, and one of the matters negotiated, unsuccessfully as it turned out, was a contract of sale.

{21} We are struck by how much of the proposed sale remained unresolved by the December 4, 1996, vote, including water rights, financing, inspection rights, tax liabilities, closing costs, and date of closing. Significantly, the vote did not attempt to coordinate the purchase of the improvements from CDS with the purchase of the real estate from Westland. Nor did the vote settle the question of financing, which is always critical to any large public purchase. In fact, the commission never approved a financial resolution for the purchase of the facility.

{22} Even the sale price for the improvements proved mercurial. The initial asking price through the fall of 1996 was the appraised value of the improvements, $2,108,621. The supplemental information for the December 4, 1996, committee meeting reported that CDS had lowered the asking price to $1,800,000, reflecting, in part, that CDS would keep the liquor license included in the original appraised value. However, at the hearing, CDS dropped the price to $1,650,000. During the period of negotiations, following the vote on December 4, 1996, county officials pushed to have the price reduced yet again.

{23} Despite the absence of an express written contract, CDS argues that an implied-in-fact contract satisfies Section 37–1–23(A). CDS contends it can prove the County agreed to purchase an identifiable property at a fixed price, and it offers various writings, such as transcripts of meetings, staff summaries, and the like to prove the terms. According to CDS, ambiguities over terms such as water rights, financing, closing dates, closing costs, and taxes are for the trial court to resolve as it does any other question of fact.

{24} CDS's argument relies extensively on *Garcia*, 1996–NMSC–029, 121 N.M. 728, 918 P.2d 7, an opinion deeply rooted in employment law. Outside the employment context, no New Mexico appellate decision has addressed whether an implied-in-fact contract constitutes a "valid written contract" within the meaning of Section 37–1–23(A).

{25} In *Garcia*, 1996–NMSC–029, ¶ 20, 121 N.M. 728, 918 P.2d 7, our Supreme Court allowed an implied-in-fact employment contract to survive an assertion of Section 37–1–23(A) immunity. There, an employee sued his governmental employer for violating the specific, written terms of its personnel manual. *Garcia* observed that a written personnel manual gave rise to an implied contract " 'if it controlled the employer-employee relationship,' " and an employee could reasonably expect the employer to conform to the manual. *Garcia*, 1996–NMSC–029, ¶ 11, 121 N.M. 728, 918 P.2d 7 (quoting *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427, 773 P.2d 1231, 1234 (1989)). The personnel manual at issue there did both, and therefore the manual met all the elements necessary for an implied contract, including mutual assent. *See id.* ¶ 15 n. 1. The Court also analyzed whether the manual undermined any policy of the immunity statute. *See id.* ¶¶ 16–17. Because all of the elements of a contract were established *and* no policy of the statute was harmed, *Garcia* held that governmental immunity had been waived. *Id.* ¶ 20.

{26} CDS urges us to expand the application of *Garcia* to cases beyond the employment arena. We have grave reservations with the proposition that *Garcia* allows implied-in-fact contracts outside of the employment context to override governmental immunity. Contracts for employment represent a unique body of law. They must be considered in light of the at-will employment rule which allows an employer to terminate an employee "for good cause, for no cause or even for cause morally wrong." *Vigil v. Arzola*, 102 N.M. 682, 686, 699 P.2d 613, 617 (Ct. App.1983) (internal quotation marks and citation omitted), *overruled on other*

*grounds by Chavez v. Manville Prods. Corp.,* 108 N.M. 643, 650, 777 P.2d 371, 378 (1989). This Court has recognized that the 19th century rule of at-will employment is harsh. *See id.* at 686–87, 699 P.2d at 617–18. To mollify the harshness of the at-will doctrine, courts have created exceptions, one of which allows contracts for employment to be implied in fact. *See id.* at 687–88, 699 P.2d at 618–19; *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919, 921 (1987) (citing implied-in-fact agreements as recognition of the court's willingness to offset the harsh effect of the at-will doctrine and to afford workers a measure of job security). The recognition of implied-in-fact contracts in the employment setting addresses the imbalance of power between the parties and enforces the reasonable expectations employers create in their employees. *See Forrester v. Parker,* 93 N.M. 781, 782, 606 P.2d 191, 192 (1980). Although an employer is not required to issue a personnel manual, once an employer makes the unilateral decision to issue a manual and encourages employees to rely on it, " 'the employer may not treat it as illusory.' " *Garcia,* 1996–NMSC–029, ¶ 13, 121 N.M. 728, 918 P.2d 7 (quoting *Lukoski v. Sandia Indian Mgmt. Co.,* 106 N.M. 664, 667, 748 P.2d 507, 510 (1988)).

{27} As a practical matter, most employment agreements in the public sector are implied-in-fact, rooted in the conduct of the parties and in a maze of personnel rules and regulations, as well as employee manuals that apply generically to all employees. Because such employee manuals are issued to government employees in a unilateral manner and must be accepted by an employee as a condition of employment, they become the binding surrogates for an express employment contract in public sector employment situations.

{28} The existence of the personnel manual became the driving force behind the result reached in *Garcia.* If not for the vision of the *Garcia* opinion, few public employees could ever sue for breach of contract, no matter how egregious the breach and no matter how well-documented the implied-in-fact relationship with the employer. The

legislative drafters of Section 37–1–23(A) could not have intended such an injustice. Given the particular nature of employment law, we decline to expand the Supreme Court's holding in *Garcia,* beyond the employment arena. *Garcia,* 1996–NMSC–029, ¶ 20, 121 N.M. 728, 918 P.2d 7 ("*On the facts of this case,* and in view of the legitimate policy goals outlined above, we hold that … governmental immunity [was waived]." (Emphasis added.)).

{29} We acknowledge the unfairness that may sometimes result from holdings such as the one we reach today. As alleged in the pleadings and suggested in the documents, CDS casts itself in the image of a business entity proceeding in good faith only to be strung along by the County and eventually abandoned, either due to bureaucratic indifference or political caprice. However, the question we must ask-because the legislative policy behind Section 37–1–23(A) demands that we ask it-is who should bear the financial risk, the business entity or the taxpayer? The Bernalillo County taxpayer will ultimately be a victim if the County has to buy a ballpark it cannot afford. One way or another, the taxpayer will be held financially accountable if CDS is allowed to sue and recover consequential damages for the breach of an implied-in-fact agreement, without the benefit of demanding that the agreement rise to the level of formality, and public scrutiny, that accompanies an express written contract.

{30} Unlike the taxpayer, the astute business person has some ability to take protective action by limiting expenditures and other, potentially adverse consequences until a "valid written contract" from the governmental entity is actually in hand. The innocent taxpayer is comparatively helpless. The legislative choice inherent in Section 37–1–23(A) recognizes that as between the two parties, business person or taxpayer, the latter most needs legal protection in the form of a governmental immunity from suit. "[T]he legislature has decreed that the risk of loss must fall, perhaps as a cost of doing business," on business entities who fail to secure written contracts, and not on the taxpayer.

*Hydro Conduit Corp.,* 110 N.M. at 180, 793 P.2d at 862.

### Promissory Estoppel Does Not Apply

{31} In an attempt to circumvent governmental immunity for claims based on contract, CDS advances a theory of promissory estoppel that would preclude the County from asserting that "no enforceable contract exists." CDS relies extensively on statements of county officials, including individual commission members, which allegedly took place outside of any duly constituted meeting of the County Commission. CDS does not attempt to explain or distinguish the only case on point, *Trujillo v. Gonzales,* 106 N.M. 620, 621–22, 747 P.2d 915, 916–17 (1987), which expressly disavowed such a claim. *Trujillo* held that statements by county commissioners not made during a "duly constituted meeting of the Board," were without statutory authority and, thus, not a valid act capable of binding the county. *Id.* at 622, 747 P.2d at 917. As stated in *Trujillo,* CDS "had no right to rely on [such] oral representations." *Id.* Political officials and public officers are limited in their authority to bind governmental entities, and the general public is charged with notice of their limitations. *See Bigler v. Graham County,* 128 Ariz. 474, 626 P.2d 1106, 1109 (Ct.App.1981) ("Persons dealing with public offices are bound, at their peril, to know the extent and limits of their power and no right can be acquired except that predicated upon authorized acts of such officers.").

{32} Even were we to assume that promissory estoppel could overcome governmental immunity after *Trujillo,* a proposition that we seriously doubt, it would fail here. The County's actions are not the kind of "shocking degree of aggravated and overreaching conduct" that would permit the application of estoppel in the first place. *State ex rel. State Highway Dep't v. Yurcic,* 85 N.M. 220, 223, 511 P.2d 546, 549 (1973).

### The Unequal Zoning Enforcement as Alleged Did Not Violate the Equal Protection Clause

{33} CDS also alleges that individual county commissioners violated its right to equal protection of the law by encouraging the County's zoning department not to enforce its regulations against the Sportsplex, CDS's only privately-owned competitor. The individual county officials responded with a claim of qualified immunity. They correctly point out that to overcome their assertions of qualified immunity, CDS "must demonstrate that (1) the defendant's alleged conduct violated a constitutional or statutory right, and (2) the right was clearly established at the time of the conduct." *Williams,* 1998–NMCA–090, ¶ 24, 125 N.M. 445, 963 P.2d 522. "If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity." *Id.* The individual county commissioners argue that because CDS has failed to demonstrate a violation of equal protection, their qualified immunity claim prevails. We agree.

{34} Although unequal application of the zoning regulations raises serious questions,

> [t]he unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). One cannot merely presume a discriminatory purpose; "there must be a showing of 'clear and intentional discrimination.'" *Id.* (quoting *Gundling v. Chicago,* 177 U.S. 183, 186, 20 S.Ct. 633, 44 L.Ed. 725 (1900)). Under this standard, a plaintiff must prove more than "mere nonenforcement against other violators." *Barber's Super Mkts., Inc. v. City of Grants,* 80 N.M. 533, 537, 458 P.2d 785, 789 (1969). Thus, CDS must demonstrate that by relaxing the zoning standards against the Sportsplex, the individual county commissioners intended to discriminate against CDS.

{35} The record fails to suggest that the alleged actions taken by individual county commissioners were done with discrimination against CDS in mind. None of the affidavits filed in response to the motion for summary judgment suggests that the treatment afforded the Sportsplex was designed to compromise the viability of CDS's ballpark. The

complaint does not even imply that the actions taken with regard to the Sportsplex were at all related to CDS. The complaint merely claims that the treatment was unfair because CDS spent money to comply with zoning regulations that the Sportsplex did not have to spend. For an equal protection allegation to succeed, CDS must demonstrate that the zoning irregularities were purposefully designed to benefit the Sportsplex at the expense of CDS. Absent any showing, or even a naked claim, that the defendants aided the Sportsplex while casting an "evil eye" toward CDS, the equal protection claims fails. *Barber's Super Mkts., Inc.*, 80 N.M. at 537, 458 P.2d at 789 (internal quotation marks and citation omitted). Therefore, the individual county commissioners were entitled to qualified immunity.

## CONCLUSION

{36} We reverse the district court's determination that an implied-in-fact contract overcame the County's assertion of governmental immunity under Section 37-1-23(A). We also reverse the district court's determination that individual county commissioners were not entitled to qualified immunity. We remand for the entry of summary judgment in favor of all Defendants.

{37} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Judge, M. CHRISTINA ARMIJO, Judge.