2004-NMCA-050

92 P.3d 667

**UNIVERSITY OF NEW MEXICO POLICE OFFICER'S ASSOCIATION, Plaintiff–Appellee,**

v.

**The UNIVERSITY OF NEW MEXICO and The University of New Mexico Police Department, Defendants–Appellants.**

**No. 22111.**

Court of Appeals of New Mexico.

March 2, 2004.

Certiorari Granted, No. 28,559, April 23, 2004.

**656**

Frederick M. Mowrer, Law Offices of Raymond G. Sanchez, Albuquerque, for Appellee.

Charles N. Estes, Jr., Office of University Counsel, Edward Ricco, Rodey, Dickason, Akin & Robb, P.A., Albuquerque, for Appellants.

## OPINION

ROBINSON, J.

{1}   This case concerns the interpretation of a collective bargaining agreement entered into in 1996 between the University of New Mexico (the University) and the University of New Mexico Police Officer's Association (the Association).   The trial court determined that the University breached its agreement with the Association by underpaying police officers and awarded damages accordingly. On appeal, the University argues that (1) under NMSA 1978, § 37–1–23(A) (1976), it is immune from suit, and (2) the action is barred because the Association failed to exhaust its administrative remedies.   We affirm.

## Background

{2}   The trial court articulated thirty-two findings of fact, which provided an extensive background for its rationale.   The University challenges only one finding of fact.   We set the background for this case based upon the remaining facts as found by the trial court. *See Tres Ladrones, Inc. v. Fitch,* 1999–NMCA–076, ¶ 17, 127 N.M. 437, 982 P.2d 488 (stating that a trial court's unchallenged findings of fact are binding on appeal).   The University recognized in the early 1990s that its system of classifying and compensating employees was in "a state of disarray" due to significant changes in both its operations and in the nature of work in general.   It hired an outside organization to study the wages being paid to its employees.   The purpose of the UNMPact, as the study came to be called, was to address the inadequacy of University pay in light of the wages paid in comparable markets.   The UNMPact classified employees and proposed to pay wages in accordance with comparable markets and the wages paid for similar work.

{3}   While the study was in progress, the Association was organized to represent the police officers and sergeants of the University's police force.   In 1996, the Association began negotiations with the University regarding the Association's first collective bargaining agreement that would cover its members.   However, by the fall of 1996, the parties had reached an impasse on the issue of officer salaries.

{4}   On October 26, 1996, Susan Carkeek, Associate Vice President and Director of Human Resources for the University, gave a presentation concerning the UNMPact to officials of the Association.   Although, conflicting testimony was presented at trial as to the substance of this presentation, the trial court expressly found that during Carkeek's presentation, representatives of the Association were told that police officer wages would be increased to an amount equal to the average salary of first-year officers for the Albuquer-

que Police Department and the Bernalillo County Sheriff's Department, effective January 1, 1997. Carkeek was specifically asked whether a comparison would be made between the Association's wages and those of smaller departments. She replied "No," that the marketplace used for this analysis would be the Albuquerque Police Department and the Bernalillo County Sheriff's Department. The average salary then for an entry-level Albuquerque Police Department or Bernalillo County Sheriff's officer was $13.68 per hour.

{5} Association representatives reported to their membership on Carkeek's presentation, and the members voted to accept an employment contract with the University which included the UNMPact. The vote was based on an express understanding that salaries would be adjusted to $13.68 per hour for those officers not presently earning that wage. The Association ratified its first collective bargaining agreement with the University on November 21, 1996, based on this understanding, and included within that agreement a provision that the parties agreed to fully implement the UNMPact.

{6} In January or February 1997, the University sent individual members of the Association letters informing them of the salary they would receive based on the UNMPact. The police officers also received instructions on filing a request for reconsideration if they objected to the new salary level. The request was to be submitted on a form provided by the University. The trial court explicitly found that the University did not mail any information concerning requests for reconsideration to the Association as required by the collective bargaining agreement. Yet, the trial court found that the Association completed a reconsideration form and submitted it to the University. This last finding is the only one challenged on appeal.

{7} Based on these findings, the trial court concluded that the collective bargaining agreement required the University to pay police officers $13.68 per hour and that the University breached the contract by paying officers less than that amount. In addition, the trial court concluded that the Association did not fail to exhaust its administrative remedies. Indeed, the trial court determined that the Association continually pressured the University, from April 1997 through the time of trial, to pay its police officers the correct wage by means of grievance proceedings, the filing of a Prohibited Practice Complaint with the Public Employee Labor Relations Board, and the exchange of letters with the University.

**Section 37–1–23(A) Does Not Immunize the University from this Lawsuit**

■ {8} The University does not challenge the trial court's finding that the Association was promised that implementation of the UNMPact would result in raising the hourly wage of its member officers to $13.68 per hour. However, it contends enforcement of this representation is barred by Section 37–1–23(A). Under the circumstances of this case, we disagree.

{9} Whether Section 37–1–23(A) bars a particular action is an issue of law that is reviewed de novo on appeal. *See Campos de Suenos, Ltd. v. County of Bernalillo*, 2001–NMCA–043, ¶ 10, 130 N.M. 563, 28 P.3d 1104 ("[T]he application of the facts of a case to an assertion of immunity, is a legal question that we review de novo.").

{10} Section 37–1–23(A) provides: "Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract." This section has been interpreted to require only that there be a valid written contract underlying a claim. *See Treloar v. County of Chaves*, 2001–NMCA–074, ¶ 16, 130 N.M. 794, 32 P.3d 803. Thus, when an action arises from a valid written contract, the action is not barred by Section 37–1–23(A) even though the action involves equitable claims such as reformation based on mutual mistake, *see Ballard v. Chavez*, 117 N.M. 1, 2 n. 2, 868 P.2d 646, 647 n. 2 (1994), or breach of an implied warranty, *see Vinnell Corp. v. State*, 85 N.M. 311, 312, 512 P.2d 71, 72 (1973) (holding that highway construction contractor who is misled by incorrect plans and specifications may recover for the resulting extra expenses). More recently, the New Mexico Supreme Court indicated that if there is a valid written contract, Section 37–1–23(A) will not bar litigation that may involve

a dispute concerning the terms and conditions of the contract. *See Handmaker v. Henney,* 1999–NMSC–043, ¶¶ 17–20, 128 N.M. 328, 992 P.2d 879.

{11} The University characterizes this dispute as involving "a contract term that was established only through alleged oral representations." We do not agree. It is undisputed that there is a valid written contract between the Association and the University. The contract provides that "[t]he parties agree to participate in and fully implement the UNMPact classification and compensation study." The question to be resolved by the trial court was what this provision meant to the Association at the time it agreed to the provision. *See Maine v. Garvin,* 76 N.M. 546, 550–51, 417 P.2d 40, 43 (1966) ("Parol evidence may not be received when its purpose and effect is to contradict, vary, modify, or add to a written agreement, but is generally admissible to supply terms not in the written contract, to explain ambiguities in the written agreement, or to show fraud, misrepresentations, or mistake."); *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 509, 817 P.2d 238, 243 (1991) ("It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions."). In determining what this phrase meant to the parties, the trial court in this case could consider "evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." *See id.* This type of evidence can be used initially to determine whether the provision was ambiguous and, if so, to resolve the ambiguity. *Ponder v. State Farm Mut. Auto. Ins. Co.,* 2000–NMSC–033, ¶ 13, 129 N.M. 698, 12 P.3d 960.

{12} The University appears to recognize that the testimony concerning Carkeek's representations made at the October 26 meeting was offered to clarify the meaning of the contract language concerning the UNMPact. However, it asserts that this approach was rejected by *Campos de Suenos,* 2001–

NMCA–043, ¶ 23, 130 N.M. 563, 28 P.3d 1104. We cannot agree. In *Campos de Suenos,* the developer of a parcel of land argued that even though there was no written contract between the developer and the county, a series of writings could be used to create a "valid written contract" within the meaning of the statute. *Id.* ¶ 12. We held that a series of writings did not satisfy the requirement of a written contract. *Id.* ¶ 19. The portion of the opinion that the University relies on recites one of the contentions of the developer. *See id.* It does not state this Court's view. Again, in this case, there was indisputably a valid written contract. The dispute is about the meaning of one provision of that contract. Thus, *Campos de Suenos* is inapposite. Considering the evidence surrounding the making of the contract, and particularly the representations made by Carkeek, the discussion about the UNMPact, and the agreement to fully implement the UNMPact classification and compensation study, we think the trial court could reasonably conclude that the dispute involves a term of the contract as contemplated in *Handmaker. See Handmaker,* 1999–NMSC–043, ¶ 20, 128 N.M. 328, 992 P.2d 879.

{13} To bolster its position that immunity is essential, the University argues that the statute was enacted to prevent fraud and to encourage adherence to appropriate processes in governmental contracting. In our view, the overriding fact is that a valid written contract exists. The issue is whether that contract was meant to include the UNMPact and the average starting salary of the police officers as represented to the Association. The overall purpose of the statute, which is to create immunity, *Campos de Suenos,* 2001–NMCA–043, ¶ 19, 130 N.M. 563, 28 P.3d 1104, was not violated by the trial court's interpretation of the statute and application of the statute to the facts.

## Exhaustion of Administrative Remedies

{14} The trial court made two determinations concerning the affirmative defense of exhaustion of remedies. First, the trial court found that the University did not mail any information concerning the request for reconsideration process to the Association as re-

quired by Section 38 of the agreement between the parties. Second, the trial court found that the Association completed the reconsideration form and submitted it to the University. On appeal, the University makes both legal and factual arguments. Legally, the University argues that because the individual police officers were notified of the reconsideration process, the Association had actual notice of the process and therefore it was not necessary to provide written notice to the Association. Factually, the University contends the trial court's finding that the Association submitted a request for reconsideration is not supported by substantial evidence, arguing that the only evidence supporting that finding was based on the members' belief that the request had been filed.

{15} We turn first to the University's argument that notice to individual members was legally sufficient. The trial court determined that Section 38 of the collective bargaining agreement required the University to give written notice of the reconsideration process to the Association. The University does not challenge this interpretation of the collective bargaining agreement. Instead, it relies on cases that provide that formal notice may not be required if the party has actual notice. However, none of the cases cited by the University involved a contract that required written notice. The cases involve situations in which a provision of a statute or contract required notice but did not specify the manner in which notice was to be given. *See In re Estate of Gaines*, 113 N.M. 652, 654–56, 830 P.2d 569, 571–73 (Ct. App.1992) (statute requiring person receive notice held satisfied when the party had been served by both sides in a will contest); *State v. Integon Indem. Corp.*, 105 N.M. 611, 612, 735 P.2d 528, 529 (1987) (actual notice to contractor that he was lowest bidder at the time bids were taken was adequate notice under Public Purchase Act); *see also Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 442–43 (1993) (statute requiring request for a final decision on a claim held satisfied when the request can be inferred from circumstances); *Bloom Township High Sch. v. Ill. Commerce Comm'n*, 309 Ill.App.3d 163, 242 Ill.Dec. 892, 722 N.E.2d 676, 689 (1999) (con-

tract requiring notice held satisfied by verbal and voice mail notice when contract did not require that company provide written notice or dedicated phone line to provide notice). Thus, the cases supplied by the University are inapposite.

{16} Next, we examine the University's challenge to the trial court's finding that the Association, and specifically then-President James Daniels, submitted the reconsideration request. We view the evidence in the light most favorable to the trial court to determine whether there is sufficient evidence to support the finding. *Lopez v. Adams*, 116 N.M. 757, 758, 867 P.2d 427, 428 (Ct.App.1993). Thus, we draw all inferences from the evidence in a manner that will uphold the finding and disregard evidence and inferences to the contrary. *Weidler v. Big J Enters. Inc.*, 1998–NMCA–021, ¶ 30, 124 N.M. 591, 953 P.2d 1089. The Association contends that this issue was not preserved because the University did not make the same substantial evidence argument below that it now makes on appeal. However, the University's motion for a directed verdict argued that there was no competent evidence to support a finding that the Association's reconsideration request was submitted. Thus, the issue was brought to the attention of the trial court, and the Association was provided an opportunity to respond.

{17} The trial court heard considerable testimony about the preparation and submission of the reconsideration request. University personnel Carkeek and Shannon Mick both testified that there was no record of the request having been submitted. On the other hand, three police officers testified that they helped prepare the reconsideration request. One of the three testified that he instructed an officer to put the request in President Daniels' box. In addition, there was testimony that the Association and its members had been informed that the request had been submitted.

{18} The cornerstone of the University's substantial evidence argument is the testimony of President Daniels. At the time the contract was negotiated and the UNMPact

was implemented, Daniels was the president of the Association.

{19} At trial, Daniels testified that he filled out two requests for reconsideration that he could recall. The first was on behalf of one or more detectives, and the second was on behalf of a corporal. On cross-examination by the University, Daniels initially testified that he never saw the request for reconsideration concerning police officers until "just now." When asked if it was "something he ever submitted on behalf of the police officers," he testified "No. When I submitted these [referring to the other two requests], I signed them. This one is not signed. I don't recall submitting a police officer. I recall submitting detectives and a corporal." Later in his testimony he again stated that he recalled submitting only a couple of requests for reconsideration. Upon redirect by the Association, he did recall that he had seen a request for reconsideration for the police officers earlier when it had been produced previously by the Association during this litigation.

{20} The University views this testimony as establishing that Daniels did not submit the reconsideration request for the police officers. However, on appeal we view the evidence in the light most favorable to the trial court's decision. *Weidler,* 1998–NMCA–021, ¶ 30, 124 N.M. 591, 953 P.2d 1089. Thus, we view Daniels' testimony as establishing only that he did not recall filing the reconsideration request on behalf of police officers.

{21} Several other witnesses testified concerning the reconsideration process. Carkeek testified that there were about 2300 reconsideration requests submitted. She was not aware of each and every request that was filed. She denied that any such requests were misplaced or lost. In addition, she testified that employees filing reconsideration requests were not required to go through their supervisors. She also testified that the Association itself did not receive notice of the reconsideration process. In addition, Mick, who oversaw the reconsideration process, testified that approximately 2400 requests were filed. She indicated this was forty percent of the employees affected

by the UNMPact. Mick also testified that, even though there were 2400 documents filed and only six or seven people on her staff to process those documents, none of the documents was ever lost or misplaced and they never had any complaints about documents being lost or misplaced. In closing argument, the Association's lawyer characterized her testimony as unbelievable.

{22} In sharp contrast to this testimony was that of Donald Birge, president of the University Staff Council which represents the non-teaching staff of the University. Birge gave specific examples of erroneous reclassifications that had occurred as part of the UNMPact process. In addition, his testimony that "during the thirty-six to forty-eight times that he helped employees at the university prepare this particular form, that, in fact, it was common to have the documents not filed, to have them lost, to have no recognition of receipt of the documents."

{23} The evidence, viewed in the light most favorable to the finding, was as follows: The Association had a copy of a request for reconsideration in its files. The University did not. Three people who were members of the Association at the time the request would have been submitted testified about their role in preparing the request. One of the three testified to instructing an officer to put the request in President Daniels' box, who did not recall submitting the request. A fourth witness, who was not a member of the Association, testified that it was not uncommon for the University to lose reconsideration requests. On the other hand, the University personnel who testified insisted that there were no complaints concerning lost reconsideration requests and that no request was ever lost, despite the large volume of requests and the small number of people available to handle them. On this state of the testimony, we think that the trial court was in the best position to "weigh the testimony, determine the credibility of the witnesses, reconcile inconsistent statements of the witnesses, and determine where the truth lies." *Sanchez v. Homestake Mining Co.,* 102 N.M. 473, 476, 697 P.2d 156, 159 (Ct.App. 1985). In this situation we defer to the trial court's resolution of the issue. *Id.* We hold

that the trial court's finding that the request for reconsideration was filed is supported by substantial evidence and that the Association thereby exhausted its administrative remedies.

### Conclusion

{24} In summary, we hold the Association's action against the University is not barred by Section 37–1–23(A). We further hold that, under the circumstances, the trial court properly rejected the University's contention that the Association failed to exhaust its administrative remedies. The University failed to pay the police officers their proper wages under the collective bargaining agreement. The judgment of the trial court is affirmed.

{25} **IT IS SO ORDERED.**

MICHAEL D. BUSTAMANTE, Judge (specially concurring).

JONATHAN B. SUTIN, Judge (specially concurring).

BUSTAMANTE, Judge (specially concurring).

{26} I concur in affirmance, though with some trepidation. The opinion applies the principles of *C.R. Anthony Co.* and *Mark V, Inc. v. Mellekas,* 114 N.M. 778, 845 P.2d 1232 (1993), with full force to reach its result. Of course, if we were dealing with private parties there would be no question that our resolution of the issue would be correct. But, we are dealing with a public entity and, though it does not control here, I believe Section 37–1–23(A) does place limits on the reach of *C.R. Anthony Co.* and *Mark V* in public sector contract cases. We do not reach that limit here.

{27} There are four factual circumstances that focus the difficulties in this case. First, we are indisputably dealing with a "valid written contract" in the form of a negotiated union agreement. The agreement places on the parties the obligation to "participate and fully implement the UNMpact classification and compensation study." Second, the trial court found that Carkeek told the union representative during negotiations

that UNMPact would only use the Albuquerque Police Department (APD) and Bernalillo County Sheriff's Office (BCSO) to set the UNMPact pay scale for its police officers, and the union agreed to the contract relying on Carkeek's representations. Third, UNMPact-which apparently covered essentially all of UNM's non academic staff-was not complete and had not been accepted by UNM senior management or the Board of Regents when Carkeek made her representations. In particular, none of the material available to the employees included any detail about the comparable data being considered to set pay scales. Fourth, when UNMPact was finalized, UNM did not limit itself to APD and BCSO pay scales.

{28} The trial court determined, and we agree, that the reference to UNMPact in the agreement is ambiguous, thus allowing the union representatives to testify what the provision meant to them when they agreed to the provision. Accepting the union's understanding of the term can be seen as simply resolving the ambiguity in a reasonable manner applying accepted contract law. Restatement (Second) of Contracts § 201(2) states:

> (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
>
> (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
>
> (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

This section cited with approval in *Pope v. Gap, Inc.,* 1998–NMCA–103, ¶ 16, 125 N.M. 376, 961 P.2d 1283.

{29} The trial court's findings of fact can be read to mean that the union and UNM representatives attached the same meaning to the UNMPact provision at the time the agreement was signed.

{30} It cannot be denied, however, that the effect of the trial court's decision, and our affirmance, is to impose a largely uncontemplated outcome on UNM's policy making process.[1] UNMPact was clearly a huge undertaking subject to the scrutiny and decision at the highest levels of UNM's administrative structure. It is problematic whether the union's reliance on Carkeek's statements about the content of an unfinalized study should be deemed reasonable. Thus, there is force to UNM's argument that the trial court's ruling creates a new agreement between the parties.

{31} Analytically, this case falls in the gap between cases such as *Campos de Suenos* and *Trujillo v. Gonzales*, 106 N.M. 620, 747 P.2d 915 (1987), on the one hand and *Garcia v. Middle Rio Grande Conservancy Dist.*, 121 N.M. 728, 918 P.2d 7 (1996), and *Handmaker* on the other.

{32} In *Trujillo*, our Supreme Court held that the oral promises by a majority of the county commissioners to the plaintiff that he would be hired for a two-year term could not be used to override or contradict the explicit terms of the county commission minutes appointing him as an at will employee. *Trujillo*, 106 N.M. at 621, 747 P.2d at 916. *Trujillo* preceded New Mexico's abandonment of the so-called "four corners standard" in *C.R. Anthony Co.* and *Mark V.* As such, its treatment of the plaintiff's ambiguity argument is somewhat dated and suspect. It is clear, however, that *Trujillo* treated Section 37–1–23(A) as imposing a real limit on the use of oral representations to escape or change unambiguous written terms of agreement.

{33} *Campos de Suenos* held that partial writings could not be used to create an enforceable agreement. We refused to "cobble together" a "slew of partial writings" as a means of finding an implied-in-fact contract between the parties because doing so would undermine the purpose of requiring a valid written contract. *Campos de Suenos*, 2001–NMCA–043, ¶ 18, 130 N.M. 563, 28 P.3d 1104. We emphasized that apart from helping to prevent fraud, the requirement of Section 37–1–23(A) was intended by the legislature to reinstate sovereign immunity from suits sounding in contract, excepting only written contracts. *Id.* ¶ 13. *Campos de Suenos* made clear that the risk of loss in marginal transactions is on the party dealing with the governmental entity. *Id.* ¶ 14.

{34} *Campos de Suenos* teaches that New Mexico courts will be very cautious in imposing contractual obligations on public entities covered by Section 37–1–23(A) in the absence of a "valid written" document accepted by the public entity at the culmination of a proper procedure.

{35} An exception to this approach is found in *Garcia* and *Handmaker*, both of which involve employee claims. In *Garcia*, our Supreme Court held that in proper circumstances a personnel manual could be enforced against a public entity as a contractual obligation even though there was no writing specifically incorporating it into the employment relationship. The Supreme Court held that no policy embodied in Section 37–1–23(A) was violated by enforcing personnel manuals adopted by public employers.

{36} Similarly, *Handmaker* arose from a contract dispute with an employee. The Supreme Court opinion quickly determined that Section 37–1–23(A) was not directly implicated in the case because the employee relied on his written employment contract for his claim and did not assert any other right based on unwritten agreements. 1999–NMSC–043, ¶ 17, 128 N.M. 328, 992 P.2d 879. The Court analyzed Dr. Handmaker's claims, applying *C.R. Anthony Co.* and *Mark V* to decide whether the written contract was ambiguous. Finding an ambiguity, the Court remanded the case for trial.

{37} Broadly speaking, *Trujillo* and *Campos de Suenos* address issues surrounding the creation of new contractual relationships whereas *Garcia* and *Handmaker* involve disagreements about the details of an existing employment relationship evidenced by a writing.

{38} In this case, we have a writing involving an employment relationship which is reasonably susceptible to different interpre-

---

1. I use the modifiers because in this context UNM must be charged to some degree with knowledge of the statement and offers made by its negotiating representatives.

tation (i.e. whether the agreement to "participate in and fully implement UNMpact" means what the union representatives were told or whether it means what the administration decided at the end of its decision process). On balance I conclude that this fact pattern is more akin to *Garcia* and *Handmaker* than *Trujillo* and *Campos de Suenos*. I do not believe the policies underlying Section 37–1–23(A) are threatened by our holding.

SUTIN, Judge (specially concurring).

{39} The Association sued for breach of an agreement it characterizes as an employment contract. It alleged:

> Grievance # 2—During a meeting prior to the Association voting to adopt the contract the Defendants represented to [Association] members that UNM PACT would reevaluate and adjust the salaries of police officers employed by [the University] Police Department by comparing salaries earned by officers employed by police departments in the geographical area. The Defendant's [sic] explained that the University would look at the Albuquerque Police Department, and Bernalillo County Sheriff's Department and then would make recommendations that the wages to be paid should be in parity with these two Departments.[1] This parity adjustment was a condition for the acceptance of UNM PACT into the contract. [The University] did perform such an evaluation but did not use the two above Law Enforcement agencies but instead broadened the scope of review. The result was the payment of salaries at a much lower rate than promised.

(Footnote added.) The Association further alleged that the University chief of police failed to comply with the grievance procedure in the contract, in that he ignored four grievances and did not issue a written resolution of the grievances. In particular, the Association alleged that the failure to address the loss of pay grievance was a material breach of the employment contract. It

sought "an award of the relief sought in [the] grievance[ ]."

{40} The primary issues on appeal boil down to (1) whether the Association effectively pursued and completed the grievance process, and (2) whether the Association's claim for a particular wage different than that ultimately arrived at and contained in the UNMPact was barred under NMSA 1978, § 37–1–23(A) (1976) immunity. I concur in the opinion's affirmance on the grievance process issue. I also concur in the opinion's affirmance on the immunity issue, but write separately as to the latter.

{41} The employment contract is a collective bargaining agreement. One provision under the compensation section of the contract states that "[t]he parties agree to participate in and fully implement the UNMPact classification and compensation study." The trial court found that, in connection with reaching agreement, including the UNMPact provision, a University representative promised the Association that the UNMPact would contain a compensation amount for University police officers arrived at through a specific process and formula based on the average wage of first year officers working with the Albuquerque Police Department and the Bernalillo County Sheriff's Department. Relying on the University's promises, the police officers ratified and the Association signed the contract with the inclusion of the UNMPact provision.

{42} The trial court also found that the University breached the employment contract by failing to adhere to the process and formula promised, and thereby failing to pay compensation as promised. The University does not attack the findings of fact and conclusions of law supporting the promises and the University's breach in failing to carry out the promises. The wage term is unquestionably a critical contract term. When it was approved and signed, the employment contract did not contain the specific wage term, nor did it set out any process or formula by which the University was to arrive at a specific wage term. The specific wage term is in

---

1. Because the district court determined that what UNM stated was a promise to include the wage parity in the UNMPact, I ignore the aver-ment that the statement was a promise only to *recommend* that the wages to be paid should be in parity.

the UNMPact, a document that was not in effect at the time the employment contract was signed, yet a document that was incorporated by reference into the employment contract.

{43} The issue under Section 37–1–23(A) is whether the Association can maintain an action for breach of the employment contract, which incorporated the UNMPact, where the UNMPact, as it was ultimately implemented, contained compensation inconsistent with what it would have been had the University adhered to its oral promises as to how it would determine the compensation to be included in the UNMPact. The employment contract and the UNMPact are written contracts. The sole basis for the underlying action is broken oral promises as to what a written document, the UNMPact, as incorporated into the written employment contract, would ultimately provide.

{44} New Mexico case law indicates that a written document might, under certain circumstances, give rise to a ground on which to tweak Section 37–1–23(A) in favor of dispensing with immunity. *See Handmaker v. Henney*, 1999–NMSC–043, ¶ 17, 128 N.M. 328, 992 P.2d 879 (appearing to state that immunity could be or was waived where the position from which the plaintiff was terminated was included in his written employment contract even though the position was not specifically mentioned in the contract); *Treloar v. County of Chaves*, 2001–NMCA–074, ¶¶ 15–17, 130 N.M. 794, 32 P.3d 803 (holding county not immune from physician's claim of breach of employment contract where physician had a written contract with hospital but not with county, but where county assumed the obligations of that contract in a separate agreement with a third party, and stating that "[w]e do not believe that Section 37–1–23(A) requires the party making the claim to be a party to [the written] contract with the governmental entity [and] only requires a written contract underlying the claim"); *Silva v. Town of Springer*, 1996–NMCA–022, ¶ 9, 121 N.M. 428, 912 P.2d 304 (stating that employment rights contained in a town ordinance can become part of the employee's at-will contract of employment); *see also Garcia v. Middle Rio Grande Conservancy Dist.*,

1996–NMSC–029, ¶ 14, 121 N.M. 728, 918 P.2d 7 (holding personnel policy to be part of an implied employment contract, and that Section 37–1–23(A)'s waiver of immunity "in cases involving valid written contracts, incorporates an implied employment contract that includes written terms as set forth in a personnel policy"); *but see Campos de Suenos, Ltd. v. County of Bernalillo*, 2001–NMCA–043, ¶¶ 24–28, 130 N.M. 563, 28 P.3d 1104 (limiting *Garcia*'s holding to "contracts for employment," and appearing to limit *Garcia* to circumstances of at-will employment, stating that such contracts "represent a unique body of law [to] be considered in light of the at-will employment rule").

{45} In regard to the issue of immunity, which is the issue that opens or closes the door to the Association's contract claim, the opinion reduces the issue to what the UNMPact provision in the contract meant, Opinion ¶¶ 11–13, and conclusorily resolves the issue by analyzing the circumstances surrounding the oral promise under the authority of *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509, 817 P.2d 238, 243 (1991), then simply concluding "that the dispute involves a term of the contract as contemplated in *Handmaker*." Opinion ¶ 12. The opinion does not mention *Trujillo v. Gonzales*, 106 N.M. 620, 747 P.2d 915 (1987), nor does the opinion mention *Garcia*, 1996–NMSC–029, 121 N.M. 728, 918 P.2d 7, which discusses and distinguishes *Trujillo*. *Garcia*, 1996–NMSC–029, ¶¶ 18–19, 121 N.M. 728, 918 P.2d 7.

### Trujillo

{46} I read *Trujillo* a little differently than my colleague, Judge Bustamante. There is nothing to indicate that the Supreme Court did not actually look at and consider the circumstances alleged by the plaintiff surrounding the oral promise of a two-year employment term. There is nothing to indicate that the Court did not make an analysis of whether the board of county commissioners' minutes ratifying the plaintiff's position were ambiguous. Indeed, the Court appears to have made that analysis, and it held that "[t]he minutes are not ambiguous," after determining that the oral

promise of a two-year employment term was inconsistent with the recitation in the minutes that the plaintiff was appointed as an exempt employee and therefore one whose employment was at will. *Trujillo*, 106 N.M. at 621, 747 P.2d at 916. The changes in methodology for determining whether an ambiguity exists made in *C.R. Anthony Co.* and in *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 845 P.2d 1232 (1993), do not change the rule applied under *Trujillo*, namely, that "[w]hile parties may leave portions of written contracts to oral expression, under such circumstances oral expressions are legally significant *only if they are not contradictory* and have some effect upon interpretation, application and legal operation of the written portion." *Trujillo*, 106 N.M. at 621, 747 P.2d at 916.

{47} In my view, *Trujillo* is not applicable. In the present case there exists no inconsistency in the express oral promises and the express written provision in the employment contract relating to the UNMPact. Furthermore, *Garcia* interprets the essential holding in *Trujillo* to be that immunity existed because a county commissioner could not legally bind the county by promising a two-year employment and, therefore, the plaintiff "could allege no valid written contract." *Garcia*, 1996–NMSC–029, ¶ 18, 121 N.M. 728, 918 P.2d 7; *see also Campos de Suenos*, 2001–NMCA–043, ¶ 31, 130 N.M. 563, 28 P.3d 1104 (same). Thus, I do not think *Trujillo* is particularly useful or instructive in arriving at a result in the present case.

{48} The University made oral promises to employ a specific process and formula to determine a wage figure, and the written contract as it ultimately came about when the UNMPact was adopted contained a wage figure reached by a process and formula different than that promised. The explicit promises of process and formula, and the explicit written contract salary figure, are not inconsistent or contradictory. What is inconsistent is the process and formula. While the action is one for breach of a written contract, the oral promises are the subject of the breach. The Association asserts that the employment contract was breached, but the unwritten, oral promises are the sole

underlying basis for that claim. The asserted breach lies in the failure of the University to adhere to the process and formula it promised to follow in arriving at a salary figure for the University police officers.

### *Handmaker*

{49} The opinion cites to and places its bets on *Handmaker*, but nowhere discusses or analyzes the case. The Court in *Handmaker* determined that the plaintiff had a written employment contract with the University of New Mexico. 1999–NMSC–043, ¶¶ 17, 22, 128 N.M. 328, 992 P.2d 879. The University conceded that the position from which it terminated the plaintiff was included in the written employment contract even though the position was not specifically mentioned in the contract. *Id.* ¶ 19. The Court, therefore, concluded that, because there existed a written contract containing the term that was the subject of the claim, Section 37–1–23(A) did not bar the plaintiff's claim of breach of contract. *Handmaker*, 1999–NMSC–043, ¶¶ 15–17, 128 N.M. 328, 992 P.2d 879. This result moved the Court onto another issue, which was whether the University was entitled to judgment as a matter of law on the ground it could terminate the plaintiff from a particular position. *Id.* ¶¶ 18–19. The Court discussed the parties' contentions, but ultimately determined that whether summary judgment was appropriate was not an issue to be decided on a writ of error (the writ having been granted and disposed of on the issue of sovereign immunity). *Id.* ¶ 20. The Court thus returned the case to the district court. *Id.* ¶ 21.

{50} In citing *Handmaker*, the opinion and Judge Bustamante necessarily rely on a footnote in *Handmaker*. *Id.* ¶ 19 n. 2. That *Handmaker* footnote relates to the following statement in the text:

Additionally, [the University] correctly asserts that in New Mexico there is a presumption that termination from employment is at will unless otherwise agreed upon by the parties, and [the University] thus claims that, because only his position as associate professor was protected by

tenure, [the plaintiff's] administrative positions were terminable at will.

*Id.* ¶ 19 (citation omitted).

{51} The footnote focuses on the University's "written policies and procedures and written statements made to [the plaintiff]" claimed by the plaintiff to "constitute an implied contractual term of termination for good cause only." *Id.* ¶ 19 n. 2. The University contended that the plaintiff could not survive summary judgment on the merits with respect to his good cause only contention because his claim was based on oral representations by officials of the University, precluded by Section 37–1–23(A). *Id.* The fact section of the opinion in *Handmaker* does not mention oral statements. *See id.* ¶¶ 2–6. Neither does the Court's discussion of the district court's determination or its discussion of and holding that the plaintiff's employment contract was written. *Id.* ¶ 17. Indeed, in that discussion, the Court stated, significantly: "In this case, [the plaintiff] had written employment contracts with [the University]. His breach of contract claim centers around the terms of employment under those contracts, including the procedure and grounds necessary for termination from an administrative position." *Id.* This language indicates, it would appear, that the Court thought "the procedure and grounds necessary for termination from an administrative position" were "terms of employment under those [written] contracts." *Id.*

{52} In my view, nothing in the *Handmaker* footnote indicates or was intended in any way to say that there existed oral representations regarding termination procedures (e.g., good cause only) on which the plaintiff relied for his breach of contract claim. Further, nothing in *Handmaker* indicates that completely verbal promises as to important contract terms can be considered with respect to either formation of a contract or the interpretation of words in an existing written contract. In my view, on the issue in the present case, *Handmaker* is not helpful.

### Policy, Harm, and Result

{53} The University sets out the policies behind Section 37–1–23(A), as discussed in *Campos de Suenos:* Prevent fraud and protect the public purse by encouraging adherence to an appropriate process in governmental contracting, including formality and public scrutiny. *See Campos de Suenos,* 2001–NMCA–043, ¶¶ 13–14, 29, 130 N.M. 563, 28 P.3d 1104. It also argues the position, set out in *Garcia,* that "governmental entities enter into more contracts than many entities in the private sector," and that "[t]he volume of public contracts is such that unless they are put to writing, the terms as to any one would likely be long forgotten in the event a dispute arose." *See Garcia,* 1996–NMSC–029, ¶ 16, 121 N.M. 728, 918 P.2d 7.

{54} I am unpersuaded that the protections intended to be granted by Section 37–1–23(A) have any persuasive value in this case. We are not concerned with individual employment or commercial contracts. We are concerned with a collective bargaining agreement, one that can receive public scrutiny and therefore is not likely subject to fraud. There exists no scent or hint of fraud in this case. Yes, the public purse is at risk, as it always is in government contracting. However, whether to hold government accountable in public contracts here must depend on other policy concerns than imposing on the public purse.

{55} Further, in this case, there was an impasse in wage negotiations. The University sent a representative to resolve that impasse, and the impasse was resolved based on the representations, if not assurances, of the University representative. Under these circumstances, the University should take the risk. The contract was signed anticipating that the UNMPact would be adopted at a later time. The parties understood that what was represented would be reflected in the UNMPact and they put a provision in the employment contract referring to the UNMPact, presumably to indicate that the parties understood what the UNMPact would contain based on the promised process and formula for determining the wage figure. What went into the UNMPact was under the control of the University. In collective bargaining, it is highly unlikely that a union collective bargaining agent would agree to leave to the complete discretion of the employer what the wages for the union mem-

bers would be. While it is not out of the question that the Association for some reason wanted the contract in place before the UNMPact was adopted and was willing to assume the risk that the UNMPact might not contain what the police officers were promised, in this case I do not see that risky judgment as a barrier to overcoming immunity.

{56} In my view, we have little alternative than to affirm the trial court's determination that immunity cannot be successfully asserted in this case. There exists a valid, written underlying contract. It incorporates the UNMPact. The court determined that the University promised that a specific process and formula would be employed to arrive at a wage to be placed in the UNMPact. The court found that the University failed to abide by the promises. The bargaining process involved not only the Association's agreement but member adoption based on the University's promises. I find it very significant that it almost defies common sense and is contrary to the nature of collective bargaining that the Association and its members would agree to give the University complete discretion to choose a wage figure. Based on these observations alone, the employment contract must be considered ambiguous. It does not contravene precedent or statutory interpretation doctrine to construe the employment contract as ambiguous and to resort to meaning. It does no harm to the policy of immunity to enforce the University's promises under these circumstances.

{57} Thus, there exists no persuasive reason to bar use of contract interpretation tools to pry into why the UNMPact ended up differently than it would have had the University followed its promised process and formula. I doubt very much that the Legislature's intent in enacting Section 37–1–23(A) could have been to bar claims for breach of contract under the circumstances in this case. I also doubt due to the unique facts and circumstances of this case that the result can be or ought to be considered an expansion or broadening of Section 37–1–23(A).