738 P.2d 1321

**Walter SANCHEZ, Plaintiff-Appellant,**

v.

**THE NEW MEXICAN, a Gannett Company, Inc., a New York corporation, Defendant-Appellee.**

**No. 16362.**

Supreme Court of New Mexico.

July 15, 1987.

Eric Isbell-Sirotkin, Albuquerque, for plaintiff-appellant.

Jones, Gallegos, Snead & Wertheim, John Wentworth, Santa Fe, for defendant-appellee.

## OPINION

SOSA, Senior Justice.

Plaintiff-Appellant Walter Sanchez (Sanchez) filed suit against Defendant-Appellee *The New Mexican* (Employer), a corporation which publishes a daily newspaper in Santa Fe. In a five-count complaint, Sanchez alleged that, in discharging him from his job, his Employer (1) breached an implied contract of employment set forth in the Employer's "Employee Policy Handbook"; (2) breached a covenant of good faith and fair dealing; (3) acted in retaliation for his having uncovered the Employer's illegal non-payment of gross receipts taxes; (4) acted negligently in not warning him of his impending discharge; and (5) intentionally or recklessly inflicted upon him emotional distress.

The trial court granted the Employer's motion for summary judgment as to count 5 of the complaint; granted the Employer's motion to dismiss as to counts 2 and 4; and granted the Employer's motion for directed verdict as to count 1. As to count 3, the jury returned a verdict in favor of the Employer. We affirm both the judgment of the court on the various motions and the verdict reached by the jury. Sanchez appeals, asserting seven errors, only four of which we feel merit discussion.

## FACTS:

Sanchez was hired on October 20, 1982 and discharged on December 7, 1983. Initially his job title was "Chief Accountant," but by the time of his discharge his job title had been changed to "Bookkeeper-Accountant," a demotion. His supervisor demoted him partially because he had neglected to account for a week's supply of newsprint. According to both Sanchez and his Employer, the reason given for his eventual discharge was "substandard work." In his complaint, however, Sanchez contends that the stated reason was merely a pretense, and that he was actually fired in retaliation for his bringing to light his Employer's nonpayment of gross receipts taxes for its national advertising accounts.

The testimony as to this issue is divided. Sanchez testified that it was he who discovered that his Employer had not been paying the requisite taxes and that he was unable to persuade his supervisors to make the payments, but his immediate predecessor in the position of chief accountant testified that she had trained Sanchez in the method to be used in paying the taxes. In addition, the Employer's comptroller, Sanchez's immediate supervisor, testified that she asked him to take care of the payment of taxes, as she had just moved to Santa Fe from out of state and was not informed as to New Mexico tax requirements.

After Sanchez was fired, but before he filed his complaint, the Employer requested

an audit by the New Mexico Taxation and Revenue Department. According to the Employer's comptroller, the audit showed that the amounts required to be paid by the Employer had indeed been paid—both before and during the time that Sanchez was employed. Sanchez's attorney challenged the comptroller's testimony on this point, contending that the Employer's records could be construed to show that the Employer was in arrears on its taxes.

Both the comptroller who was employed during Sanchez's tenure, and the comptroller who succeeded her, testified that the reason why the Employer did not bill some of its national advertising clients for sales tax, and thus the reason why an anomaly appeared in the Employer's own gross receipts tax records, was that the Employer billed preferred clients for advertising without identifying the accompanying tax as a tax. In other words, the Employer contends that it billed preferred customers for both sales and sales tax without distinguishing between the two.

Sanchez also contends that the Employer was bound by the language contained in the employees' handbook, which he contends constituted an implied contract between him and his Employer. The Employer's personnel director, however, testified that the handbook was merely a "suggested guideline" by which the Employer measured employees' conduct, and that the "discretion of the supervisor" in every case controlled the material printed in the handbook. Sanchez argues to the contrary by quoting language in the handbook which states that the Employer would attempt to give an employee who is in danger of discharge "repeated warnings," and that the Employer would fire an employee without having given such warnings only "for cause." One of these "for cause" reasons was unreported absences from work. Sanchez admittedly missed two days of work without reporting in to his supervisor.

At trial Sanchez admitted that he told his supervisor when she fired him that he "was going to get her" for not having paid the taxes at issue, by which he meant that he was going to report the Employer to the authorities. He also admitted that a document which he alleged to be a key element substantiating his complaints of retaliatory discharge and intentional or reckless infliction of emotional distress (a confidential memo written by the comptroller recommending that his position be terminated for budgetary reasons), was not left lying about for all to see, but was instead uncovered by his own efforts in rummaging through papers on top of the comptroller's desk during her absence.

Sanchez further admitted that he possessed no signed, written employment contract other than the "implied contract" contained in the handbook, and that the Employer had a right to discharge him for his unreported absences. Further, he testified that *after* he had complained about the Employer's non-payment of gross receipts taxes, he had nonetheless received a standard increase in salary. Sanchez raises several issues on appeal which we address in descending order of importance.

## I. THE "RETALIATORY DISCHARGE" ISSUE

 In order to succeed on this issue, Sanchez would have to come within the confines of the rule established in *Vigil v. Arzola, rev'd on other grounds,* 101 N.M. 687, 687 P.2d 1038 (1984), 102 N.M. 682, 699 P.2d 613 (Ct.App.1983), which (1) followed the established rule that unless there is an explicit contract of employment stating otherwise, employment is terminable "at will," and which (2) held that the only exception to this established rule is a situation in which an employee's discharge results from the employer's violation of a clear public policy. We adhered to this rule both in *Francis v. Memorial General Hospital,* 104 N.M. 698, 726 P.2d 852 (1986), and in *Boudar v. EG & G, Inc.,* 105 N.M. 151, 730 P.2d 454 (1986). In *Maxwell v. Ross Hyden Motors, Inc.,* 104 N.M. 470, 722 P.2d 1192 (Ct.App.1986), the court of appeals clarified its holding in *Vigil* by

stating, "*Vigil* did not sound the death knell of the at-will rule. To the contrary, it simply adopted a limited 'public policy' exception to the rule." *Id.* at 473, 722 P.2d 1192. Elsewhere the rule established in *Vigil* is described as "the current trend in this country." *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 886 (10th Cir.1985). In our opinion both the trial court and the jury possessed sufficient credible evidence to justify the Employer's claim that Sanchez's discharge had nothing to do with his complaints about the supposed non-payment of gross receipts taxes. Therefore we need not decide whether an employee's discharge for "blowing the whistle" on an employer for not making tax payments constitutes the tort of retaliatory discharge according to the rule established in *Vigil.* We will continue to define on a case-by-case basis violations of public policy in retaliatory discharge suits. Here we simply hold that Sanchez's discharge was not as a matter of law retaliatory, but could have been based, as the jury apparently decided, on grounds which authorized his Employer to terminate him "at will."

## II. THE "IMPLIED CONTRACT" ISSUE

■ Sanchez asserts that the employee handbook constituted an implied contract between him and his Employer. In *Forrester v. Parker*, 93 N.M. 781, 606 P.2d 191 (1980), we recognized that an employee handbook could indeed constitute an implied contract of employment. Here, however, we are not dealing, as in *Forrester*, with an employee who has passed from a probationary to a permanent status after adhering to certain specific requirements set forth in the handbook in question. Further, in *Forrester* we were concerned with the issue of whether the procedural requirements for terminating an employee as spelled out in the handbook were followed.[1]

Here we are concerned with the issue of whether the employee handbook is itself the contract, i.e., the written agreement of employment between Sanchez and his Employer. In our opinion, the evidence supports the Employer's contention that the handbook lacked specific contractual terms which might evidence the intent to form a contract. The language is of a non-promissory nature and merely a declaration of defendant's general approach to the subject matter discussed. Accordingly, the trial court was justified in granting the employer's motion for directed verdict.

## III. THE "BREACH OF GOOD FAITH" ISSUE

■ We will allow Sanchez's brief to speak for itself on this issue. The brief states that the duty to act in good faith and to use fair dealing in a contractual setting is "imposed by law rather than arising from the terms of the contract itself." This argument, however, ignores that there *is* no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing. Sanchez was an "at will" employee who could be dismissed for any or no reason. Certainly the reason for his discharge was far less malevolent than that given by the employer in *Zuniga v. Sears, Roebuck & Co.*, 100 N.M. 414, 671 P.2d 662 (Ct.App.1983), *cert. denied* 100 N.M. 439, 671 P.2d 1150 (1983), where an employee was fired for stealing a television set, and not rehired after the accusation of theft was shown to be erroneous. Yet, in that case the court of appeals upheld the employee's discharge because he lacked a contract for a specific term. As in *Zuniga*, we continue to follow the "employment-at-will" rule here.

## IV. THE "EMOTIONAL DISTRESS" ISSUE

The record fails to disclose facts sufficient to support Sanchez's claim that the employer inflicted emotional distress upon

---

1. In his brief on appeal Sanchez's attorney attached a copy of a case which he asserted as support for his client's position as well as a copy of the employees' handbook in the *Forrester* case, even though neither of these attachments was a part of the record. We discourage such a practice.

him, either intentionally or recklessly. And since the facts uncovered by pretrial discovery and argued at the hearing on motion for summary judgment were substantiated by the evidence at trial, we conclude that the trial court exercised sound discretion in granting the employer's motion for summary judgment. SCRA 1986, 1–056(C) requires that there be no genuine issue as to any material fact related to the allegation of emotional distress, and that was in fact the case here.

Sanchez raises several other issues on appeal, none of which is meritorious. Accordingly, we find that there was no contract of employment existing between Sanchez and his Employer; that the Employer breached neither a duty of good faith nor of fair dealing; that Sanchez's discharge was not retaliatory, and that his contention that the Employer intentionally or recklessly inflicted emotional distress upon him is unfounded. The judgment of the trial court as to all five counts of the complaint is affirmed.

SCARBOROUGH, C.J. and WALTERS, J., concur.