2007-NMCA-030

154 P.3d 681

**Jessica Nichole RUEGSEGGER, Plaintiff–Appellant/Cross–Appellee,**

v.

**The BOARD OF REGENTS OF WESTERN NEW MEXICO UNIVERSITY and John Counts, Ph.D, and Chris Farren, Ph.D, individually and in their official capacities as President and Vice President of WMNU, Defendants–Appellees/Cross–Appellants.**

**No. 25,960.**

Court of Appeals of New Mexico.

Aug. 16, 2006.

Certiorari Denied, No. 30,054, Nov. 15, 2006.

Sherry J. Tippett, Albuquerque, NM, Peter Thomas White, Santa Fe, NM, for Appellant.

Beall & Biehler, P.A., Josh A. Harris, Albuquerque, NM, for Appellees.

## OPINION

PICKARD, Judge.

{1} Plaintiff, Jessica Nichole Ruegsegger, appeals an order dismissing her complaint for breach of contract against Defendants, the Board of Regents of Western New Mexico University (WNMU), John Counts, Ph.D., and Chris Farren, Ph.D., and a second order refusing to allow Plaintiff leave to file an amended complaint. Defendants cross-appeal from the portion of the amended order awarding dismissal under Rule 1–012(B)(6) NMRA, instead of summary judgment. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} Plaintiff was attending WNMU on an athletic scholarship in the spring of 2004. On April 13, 2004, Plaintiff was allegedly raped by two WNMU football players. Plaintiff was dissatisfied with the ensuing investigation by WNMU and, on August 19, 2004, she filed a complaint against Defendants for intentional infliction of emotional distress, violation of Title IX, breach of contract, and breach of an implied covenant of good faith and fair dealing. Plaintiff alleged that WNMU officials breached their contractual obligations by deliberately failing to follow WNMU policies and procedures in investigating the sexual attack, failing to provide a school free from harassment and hostility, and failing to provide reasonable support for her following the assault. The case was removed to federal court which, pursuant to Plaintiff's unopposed motion and the stipulation of the parties, dismissed the Title IX claim and remanded to state court.

{3} Defendants filed a motion to dismiss pursuant to Rule 1–012(B)(6), claiming governmental immunity and arguing that there was no contract, express or implied, between Plaintiff and WNMU as a matter of law. They also filed an expedited motion for a protective order to stay discovery until the district court ruled on their motion to dismiss. In response to the motion for a protective order, Plaintiff stated that no discovery requests of any kind had yet been made, but also acknowledged that she had been attempting to set depositions for WNMU officials without success.

{4} In response to the motion to dismiss, Plaintiff claimed that she had an enforceable, written contract with WNMU in the form of three Athletic Scholarship Agreements and that she had an implied contract based upon the WNMU Student Handbook. She conceded that Defendants were entitled to immunity on her intentional infliction of emotional distress claim and sought leave to file a stipulated motion to amend her complaint to omit the emotional distress claim and to proceed on the breach of contract claim.

{5} As exhibits to her response, Plaintiff attached copies of two Athletic Scholarship Agreements dated April 23, 2002, and May 1, 2003, respectively. She also attached a copy of her affidavit stating that she had attempted to obtain her most recent Athletic Scholarship Agreement and a letter of intent, but she was denied immediate access to those documents by WNMU employees. She concluded by asking for summary judgment in her favor.

{6} In reply, Defendants claimed that by attaching exhibits Plaintiff had transformed the motion into one for summary judgment. They also argued that Plaintiff's breach of contract claim failed because the Scholarship Agreements only require WNMU to provide scholarship funds and only require Plaintiff, but not WNMU, to comply with university regulations. Finally, they noted that Plaintiff could not recover against the individual Defendants due to governmental immunity.

{7} After a hearing, the district court granted Defendants' motion to dismiss. The court also found that Plaintiff had turned the motion to dismiss into a motion for summary judgment by attaching evidence outside of the pleadings.

{8} Plaintiff filed a motion to reconsider and a motion for leave to file an amended complaint. She attached a proposed amended complaint alleging claims for breach of contract and breach of an implied covenant of good faith and fair dealing, with copies of the WNMU Student Handbook and the Scholarship Agreement dated May 1, 2003, attached.

{9} The district court denied Plaintiff's motion for reconsideration by issuing an amended order granting Defendants' motion to dismiss. In the amended order, the court found that Plaintiff did not turn the motion to dismiss into a motion for summary judgment. Defendants filed a motion to reconsider the district court's ruling that Plaintiff did not convert the motion to dismiss into a motion for summary judgment, which was not ruled upon and therefore deemed denied. The district court also denied Plaintiff's motion for leave to file an amended complaint.

{10} Plaintiff appeals the order dismissing her complaint and the order denying her motion for leave to file an amended complaint. Defendants cross-appeal, claiming that Plaintiff's attachments converted the motion into one for summary judgment instead of dismissal on the pleadings.

**STANDARD OF REVIEW**

{11} "A motion to dismiss for failure to state a claim under Rule 1–012(B)(6), 'tests the legal sufficiency of the complaint, accepting all well-pleaded factual allegations as true.'" *Henderson v. City of Tucumcari,* 2005–NMCA–077, ¶ 7, 137 N.M. 709, 114 P.3d 389 (quoting *Derringer v. State,* 2003–NMCA–073, ¶ 5, 133 N.M. 721, 68 P.3d 961). The motion will only be granted if "the law does not support a plaintiff's claim under any set of facts subject to proof." *Henderson,* 2005–NMCA–077, ¶ 7, 137 N.M. 709, 114 P.3d 389. We review rulings on Rule 1–012(B)(6) motions de novo. *Id.*

{12} In addition to challenging the dismissal of her original complaint, Plaintiff claims that the district court should have granted her leave to file an amended complaint. The trial court's decision on a motion to amend is reviewed for abuse of discretion. *Dominguez v. Dairyland Ins. Co.,* 1997–NMCA–065, ¶ 17, 123 N.M. 448, 942 P.2d 191. Although, in general, leave to amend is freely granted, whenever the insufficiency or futility of the proposed amended pleading is apparent on its face, leave to amend may be denied because granting the motion "would serve no purpose." *Stinson v. Berry,* 1997–NMCA–076, ¶ 9, 123 N.M. 482, 943 P.2d 129 (recognizing that the futility of an amended complaint is a reasonable basis for denying leave to amend); *see Thompson v. Montgomery & Andrews, P.A.,* 112 N.M. 463, 467, 816 P.2d 532, 536 (Ct.App.1991) (holding that the district court did not err in refusing to allow the plaintiff to amend his complaint because the plaintiff failed to demonstrate that he had any "viable alternative claim against these defendants").

{13} If we conclude that the district court correctly ruled that Plaintiff failed to state a valid claim for breach of contract in her original complaint and that failure was not corrected in the proposed amended complaint, we will affirm the district court's decision to deny Plaintiff's motion for leave to file

the amended complaint. *See, e.g., Home & Land Owners, Inc. v. Angel Fire Resort Operations, L.L.C.,* 2003–NMCA–070, ¶ 33, 133 N.M. 733, 69 P.3d 243 (affirming the district court's denial of plaintiff's motion to amend when the proposed amendment sought to assert claims that were premised on the same contention that was previously rejected). Therefore, in reviewing the dismissal of the breach of contract claim pursuant to Rule 1–012(B)(6), and the refusal of the district court to allow Plaintiff to file her proposed amended complaint, we consider (1) the contents of Plaintiff's complaint and the proposed amended complaint, assuming that the facts alleged therein are true, and (2) the attached documents which purport to constitute an enforceable contract. *See Kirkpatrick v. Introspect Healthcare Corp.,* 114 N.M. 706, 709, 845 P.2d 800, 803 (1992).

## DISCUSSION

### The Complaint and Proposed Amended Complaint

{14} In support of her claim for breach of contract, Plaintiff's complaint includes the following allegations: "[T]hree days after the rape, Plaintiff informed her coach ... [who] did not direct or recommend that the Plaintiff contact the police and ... did not instruct the Plaintiff to get immediate medical attention to preserve evidence of the rape." Plaintiff's coach was immediately directed by WNMU officials to "cease any assistance to Plaintiff." Neither Defendant WNMU nor its agents convened "a 'Crisis Intervention Team' as required by the WNMU Student Handbook." After promising Plaintiff that she would receive findings and conclusions from the "Student Appeals Hearing Committee" within two days of the investigation, Plaintiff was never given written findings. Plaintiff was verbally informed that the Student Appeals Committee had determined that WNMU would not take any disciplinary action in the matter " 'because alcohol had been used by all parties.' " WNMU officials told local newspapers that an investigation was still ongoing two days after Plaintiff was verbally informed that no disciplinary action would be taken. Plaintiff was "intentionally misinformed and mislead [sic] by Defendant and its agents since reporting the rape to her

coach." Defendants' deliberate indifference to Plaintiff's sexual assault caused her to resign from the basketball team and discouraged other female students from reporting acts of sexual assault to WNMU administration. Defendants represented to Plaintiff "verbally and in writing, that [WNMU] would provide Plaintiff with a school free from harassment and hostility and that it would follow its policies and procedures." Defendants subjected Plaintiff to "humiliation and unfair treatment by deliberately failing to follow[ ] [WNMU's] policies and procedures after the rape." Defendants failed to "provide reasonable support following the assault."

{15} In her proposed amended complaint, Plaintiff reiterates the allegations set forth in her original complaint. She also adds allegations that (1) her contract with WNMU referenced the WNMU Student Handbook by stating that Plaintiff must "comply with team athletics department and regulations of the institution"; (2) the only document containing WNMU rules and regulations is the Student Handbook; (3) the WNMU Student Handbook applies mutually to the students and to WNMU; and (4) Defendants' deliberate indifference to Plaintiff's assault, failure to support her, and failure to take any disciplinary action resulted in a hostile environment that "deprived Plaintiff of access to the educational opportunities and benefits provided by the school, including playing with [the] women's basketball team."

{16} Taking these allegations as true, as we must for purposes of a motion to dismiss, we now turn to the provisions of the Scholarship Agreements and the Student Handbook to determine whether, as Plaintiff alleges, WNMU was contractually obligated to provide investigatory and support services after Plaintiff was sexually assaulted. *See Envtl. Control, Inc. v. City of Santa Fe,* 2002–NMCA–003, ¶ 6, 131 N.M. 450, 38 P.3d 891.

### The Scholarship Agreement

{17} The only explicit written contracts between Plaintiff and WNMU are the Scholarship Agreements. The provisions of the Scholarship Agreements are unambiguous, so we need only apply them as written.

*See R. & R. Deli, Inc. v. Santa Ana Star Casino,* 2006–NMCA–020, ¶ 13, 139 N.M. 85, 128 P.3d 513; *Envtl. Control, Inc.,* 2002–NMCA–003, ¶¶ 14–15, 131 N.M. 450, 38 P.3d 891.

{18} Pursuant to these agreements, WNMU promises (1) to provide the specified amount of financial aid if Plaintiff fulfills her portion of the contract and (2) not to increase, reduce, or cancel the promised aid due to athletic performance or ability to contribute to the team's success or if Plaintiff is prevented from participating in athletics due to injury, illness, or "any other athletic reason." The Scholarship Agreements provide that the aid can be immediately reduced or cancelled if Plaintiff voluntarily withdraws from the sport for personal reasons or fails to "comply with team, athletic department, or university regulations." The Agreements make no reference to any duty on the part of WNMU to comply with any university regulations or to investigate claims of harassment, sexual assaults, or any other misbehavior by other students.

{19} The Scholarship Agreements only purport to bind Plaintiff, not Defendants, to compliance with university "regulations" as a condition of the contract. Plaintiff is correct that a valid contract requires mutuality of obligation. *See Bd. of Educ. v. James Hamilton Constr. Co.,* 119 N.M. 415, 420, 891 P.2d 556, 561 (Ct.App.1994). However, mutuality does not require that the consideration provided by both parties be identical and, in this case, there is mutuality of obligation in the terms of the Scholarship Agreements. The Scholarship Agreements require Plaintiff to maintain acceptable academic performance, play basketball, and comply with WNMU's regulations. In exchange, WNMU is obligated to provide Plaintiff with scholarship assistance for her education.

{20} Based upon the express terms of the Scholarship Agreements, Plaintiff's complaint and proposed amended complaint fail to state a cognizable claim for breach of contract because neither the complaint nor the proposed amended complaint contains any allegations that Defendants breached

their contractual duty to provide scholarship assistance in the form of financial payments.

**The Student Handbook**

{21} Plaintiff argues that the Student Handbook is also part of the "contract" because the Scholarship Agreements require her to comply with team, athletic department, and university regulations. She argues that all of the rules and regulations in the Handbook are integrated into the contract by this reference in the Scholarship Agreements.

{22} As an initial matter, we address Defendants' contention that they are immune from liability because the terms of the Student Handbook are at most either implied-in-fact in the Scholarship Agreements or an implied-in-fact contract. Defendants contend that governmental immunity is waived for claims based on a contract only if the contract is written. *See* NMSA 1978, § 37–1–23(A) (1976). Thus, they argue that they are immune from liability for claims based upon the Student Handbook because, pursuant to Section 37–1–23(A), implied-in-fact contracts are not "written contracts" for which immunity is waived, except in the employment context. *See Campos de Suenos, Ltd. v. County of Bernalillo,* 2001–NMCA–043, ¶ 26, 130 N.M. 563, 28 P.3d 1104 (expressing this Court's "grave reservations" concerning whether implied-in-fact contracts should override governmental immunity outside of the employment context). We apply a de novo review to the application of Section 37–1–23(A) to the facts of this case. *Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.,* 2005–NMSC–030, ¶ 8, 138 N.M. 360, 120 P.3d 442; *Campos de Suenos, Ltd.,* 2001–NMCA–043, ¶ 10, 130 N.M. 563, 28 P.3d 1104. While acknowledging the reservations expressed by this Court in *Campos de Suenos,* for purposes of this case we can assume without deciding that Section 37–1–23(A) does not bar Plaintiff's claim based upon the terms of the Student Handbook because we hold that Plaintiff has failed to state a valid claim for breach of contract based upon the language of the Student Handbook.

{23} The question of whether a student handbook creates a contractual relationship

between a student and a post-secondary educational institution is an issue of first impression in New Mexico. We look to cases that have arisen in the employment context for guidance.

**{24}** To establish a claim for breach of implied contract based upon the terms of the Student Handbook, Plaintiff was required to demonstrate that those terms created a reasonable expectation of contractual rights. *Cf. Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672, 857 P.2d 776, 783 (1993) ("An implied contract is created only where an employer creates a reasonable expectation."). The reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue. *Id.* Although the determination of whether an implied contract exists may be an issue of fact in most cases, we first consider whether, as a matter of law, based upon the language of the Student Handbook, Plaintiff could reasonably expect that WNMU would be obligated to perform a more comprehensive investigation into her claims and to provide her with more "support" after she informed WNMU officials of the assault. *Cf. Kiedrowski v. Citizens Bank*, 119 N.M. 572, 575, 893 P.2d 468, 471 (Ct.App.1995) (recognizing that, to defeat the employer's prima facie case for summary judgment, the employee had to persuade the court that her expectations satisfied "a certain threshold of objectivity").

**{25}** The Handbook contains (1) a student code of conduct and sanctions that can be imposed against a student who violates the code, (2) a description of academic standards and procedures that will be used when considering the imposition of sanctions for poor academic performance and appeal of those sanctions, (3) a provision for a disciplinary committee that hears cases involving student discipline without specifying the type of hearings that should be conducted except to recognize a student's right to due process, (4) a drug and alcohol policy with specified procedures for any student who violates the policy, and (5) a general nondiscrimination policy.

**{26}** The Student Handbook also contains a section on the Student Appeals Committee, which pertains to appeals from various committees including the disciplinary committee. This section confers upon students the right to be present, bring witnesses, be accompanied by an attorney, and have no one but committee members present. The section provides that "[t]he student" will be given verbal notification of the committee's decision and written notification will follow "in a timely manner." This section does not clarify whether the phrase "[t]he student" refers to the student being disciplined, the complaining student, or both.

**{27}** The Handbook's "sexual harassment policy statement" consists of a general statement of WNMU's commitment to maintaining an environment free of sexual discrimination and "objectionable and disrespectful conduct and communication of a sexual nature." Students who feel they have been harassed are encouraged to contact the Director of Affirmative Action/EEO. Students are also encouraged to report "[c]onduct of a sexual nature" to "their immediate supervisor, and/or appropriate vice president, and/or Affirmative Action."

**{28}** The handbook also contains a section titled "RESPONSE TO AN ALLEGED SEXUAL ASSAULT" which states that "[t]he University has established the following Crisis Intervention Team to respond to any emergencies concerning sexual assaults." It then states that the "Crisis Team is as follows" and lists (along with phone numbers) campus police, Vice President of Student Affairs, Vice President of Counseling, and Vice President of Housing. This section recommends that at least two team members respond to any emergency and that the team should include male and female members when possible. It appears undisputed that this team neither convened nor responded in Plaintiff's case. There is no reference in the sexual harassment policy statement or the section addressing sexual assaults to investigatory procedures, investigatory rights, supportive services (beyond the listing of telephone numbers), or sanctions that should be imposed upon students found to have committed sexual assaults or harassment.

**{29}** Finally, the Handbook states that its provisions "are not to be regarded as a contract" and WNMU specifically reserves the

right to amend the handbook at any time "as required for effective management of the University."

{30} Review of these Handbook provisions indicates that, instead of contractually guaranteeing a right to specific types of investigation, support, and sanctions in the event of a sexual assault, they provide guidelines for the operation of WNMU. Therefore, they do not constitute the terms of an implied contract and do not contractually guarantee the rights asserted by Plaintiff. *See Sanchez v. The New Mexican,* 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987) (affirming the dismissal of an implied contract claim on grounds that "the handbook lacked specific contractual terms which might evidence the intent to form a contract ... [insofar as the] language is of a non-promissory nature and merely a declaration of defendant's general approach"); *Stieber v. Journal Publ'g Co.,* 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct. App.1995) (holding that general policy statements in a handbook are "insufficient to create an implied contract" because they are merely declarations of a general approach to the subject matter); *see also Goodman v. President & Trustees of Bowdoin Coll.,* 135 F.Supp.2d 40, 56 (D.Me.2001) (holding that handbook language that " '[d]iscrimination ... has no place in an intellectual community ... [and][s]uch practices violate both the ideals of the College and its Social Code and are subject to appropriate disciplinary sanctions' " does not indicate a contractual obligation by the college to refrain from discrimination). Even though the Student Handbook sets out a general framework of policies, we are not persuaded that the language contractually obligates WNMU to conduct any specific type of investigation, to provide support services, or to impose specific discipline.

{31} Likewise we are unpersuaded that Plaintiff's allegation that Defendants failed to convene a crisis intervention team states a claim for breach of contract. The Student Handbook never requires that such a team be "convened" nor does it require any specific responsive action by such a "team."

{32} Plaintiff cites to a number of cases in which courts have held that the relationship between students and post-secondary educational institutions is contractual in nature. *See, e.g., Johnson v. Schmitz,* 119 F.Supp.2d 90, 93 (D.Conn.2000); *Wickstrom v. N. Idaho Coll.,* 111 Idaho 450, 725 P.2d 155, 157 (1986); *Peretti v. Montana,* 464 F.Supp. 784, 786 (D.Mont.1979), *rev'd on other grounds,* 661 F.2d 756 (9th Cir.1981); *Behrend v. Ohio,* 55 Ohio App.2d 135, 379 N.E.2d 617, 620 (1977); *Smith v. Ohio State Univ.,* 53 Ohio Misc.2d 11, 557 N.E.2d 857, 859 (Cl.Ct.1990); *Aase v. S.D. Bd. of Regents,* 400 N.W.2d 269, 270 (S.D.1987); *Marquez v. Univ. of Wash.,* 32 Wash.App. 302, 648 P.2d 94, 96 (1982). However, all of these cases involve claims by students that their respective educational institutions had breached promises relating to academic matters or access to educational programs. *See, e.g., Peretti,* 464 F.Supp. at 786–87 (holding that a vocational institution had an implied contractual obligation to allow a student who had completed three out of the six quarters of an aviation technology course to complete the remaining quarters needed to obtain a diploma); *Behrend,* 379 N.E.2d at 620–21 (holding that a student could establish an action for breach of contract when the school lost its accreditation); *cf. Aase,* 400 N.W.2d at 270–71 (holding that students who had enrolled at one campus for the 1983–84 school year had no contractual rights against the Board of Regents to continue their education at that same campus for the following years once the legislature decided to close that campus).

■ {33} None of the cases cited by Plaintiff support her conclusion that, merely because there is a contractual relationship between a university and a student, the university is contractually bound to honor every provision found in a student handbook. *See Marquez,* 648 P.2d at 97 (recognizing that the prelaw handbook did not create "a right in the applicant to obtain a law degree absent his meeting and maintaining reasonable standards established by the Law School"). Instead, these cases recognize that, like all obligations imposed pursuant to implied contractual terms, the contractual obligations imposed by the language in a student handbook center around what is reasonable. *See Peretti,* 464 F.Supp. at 787. It is reasonable

that a school would promise to offer the classes specified in a handbook and to confer certain degrees or licenses listed in a handbook in exchange for the payment of tuition, satisfactory performance of the academic requirements, and compliance with school regulations concerning matters such as honesty. *See, e.g., Johnson,* 119 F.Supp.2d at 96 (describing a claim that the school failed in its express and implied contractual duties to "safeguard students from *academic* misconduct, to investigate and deal with charges of *academic* misconduct, and to address charges of *academic* misconduct in accordance with its own procedures" (emphasis added)); *Peretti,* 464 F.Supp. at 786 (interpreting the contract between the student and school as one in which "the student agrees to pay all required fees, maintain the prescribed level of academic achievement, and observe the school's disciplinary regulations, in return for which the school agrees to allow the student to pursue his course of studies and be granted a diploma upon the successful completion thereof" (internal quotation marks and citation omitted)). Absent terms expressly guaranteeing a right to non-academic services, we disagree that it is reasonable for Plaintiff to expect that WNMU has promised such services.

{34} Plaintiff has failed to cite to any case law, and we are unaware of any, in which a school, pursuant to a handbook or catalogue, was found to have contractually guaranteed to perform certain investigatory procedures into allegations of sexual assault perpetrated by other students. Plaintiff cites to *George v. University of Idaho,* 121 Idaho 30, 822 P.2d 549 (Ct.App.1991), to support her claim, alleging that WNMU has "precisely the same contractual obligation" to her based on the student handbook as the University of Idaho had to the student in *George.* We disagree.

{35} *George* involved a law student's claim that one of her professors was sexually harassing her by using threats and coercion in attempting to make her resume a relationship with him. *Id.* at 550–51. The court held that the University had an implied contractual obligation to investigate the suspected harassment and take appropriate corrective measures in order to "fulfill its responsibilities in pursuit of the academic goals and objectives of all members of the university community." *Id.* at 557 (internal quotation marks omitted). The obligation imposed in *George,* to protect a student from harassment or pressure perpetrated by a professor or another person in power, is distinct from the protection that Plaintiff seeks in this case, to wit, an after-the-fact investigation into wrongdoing perpetrated by another student. The former situation presents a much stronger case for requiring the school to address the problem. *See id.* at 553 (defining harassment in the handbook as "unwelcome sexual advances, ... when ... submission to such conduct is made either explicitly or implicitly a term or condition of a student's grade or ... a basis for a decision affecting that student" (internal quotation marks and citation omitted)).

{36} Based upon the language of the Student Handbook, Plaintiff could not reasonably expect, as a matter of law, that Defendants were contractually obligated to perform the investigatory and support services claimed by Plaintiff in her complaint. Contrary to Plaintiff's contentions, dismissal of her lawsuit does not indicate that students in New Mexico are entitled to less contractual protection than students elsewhere. Instead, dismissal only indicates that students' contractual protections, absent explicit language to the contrary, will be confined to the scope of their academic relationship with an educational facility. Based upon the foregoing, the district court did not err in dismissing Plaintiff's complaint and denying her motion to file an amended complaint because Plaintiff failed to state a cognizable claim for breach of contract, express or implied, against WNMU.

{37} In light of our holding that Plaintiff failed to allege a cognizable claim for breach of contract against any Defendant in her complaint or proposed amended complaint, we need not address Plaintiff's contention that in seeking leave to file an amended complaint, she was not acting in bad faith or with a dilatory motive. Plaintiff's motives and the timing of her motion to amend are irrelevant in light of her failure to allege a cogniza-

ble claim for breach of contract in her proposed amended complaint.

## Implied Covenant of Good Faith and Fair Dealing

■ {38} In her complaint and proposed amended complaint, Plaintiff alleges a breach of an implied covenant of good faith and fair dealing. As an initial matter, we note that New Mexico courts have yet to address whether a claim for breach of an implied covenant of good faith and fair dealing would be recognized in a contract or implied contract between a university and a student. Again, assuming without deciding that such a claim might be recognized in some situations, we hold that Plaintiff failed to state a cognizable claim for breach of an implied covenant of good faith and fair dealing in this case.

■ {39} "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852, 856 (1994). As previously discussed in this opinion, Plaintiff failed to show that the parties had an agreement as to the type of investigation that WNMU must conduct, the type of support services that WNMU must provide, or the sanctions that it must impose when a student brings allegations of sexual assault. There is nothing in the language of the Scholarship Agreements or the Student Handbook indicating that WNMU's refusal to conduct additional investigation, to provide support, or to impose sanctions on the persons who assaulted Plaintiff deprived Plaintiff of the benefit of her Scholarship Agreements or access to the academic resources of WNMU. *See Smoot v. Physicians Life Ins. Co.*, 2004–NMCA–027, ¶¶ 13, 14, 135 N.M. 265, 87 P.3d 545 (stating that covenant of good faith is not breached when a party is given the product or service bargained for). In the absence of a showing that Defendants' actions deprived Plaintiff of the benefit of her agreement, Plaintiff could not, as a matter of law, prevail on a claim that her contractual rights were violated in an intentional way or with bad faith. *See Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 212–13, 880 P.2d 300, 309–10 (1994) ("[T]he implied covenant of good faith and fair dealing protects only against bad faith— wrongful and intentional affronts to the other party's rights, or at least affronts where the breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential of harm to the other party." (footnote omitted)), *limited on other grounds by Sloan v. State Farm Mut. Auto. Ins. Co.*, 2004–NMSC–004, ¶ 12, 135 N.M. 106, 85 P.3d 230.

## Cross-appeal

■ {40} We now turn to Defendants' cross-appeal. Defendants contend that Plaintiff converted the motion to dismiss into a motion for summary judgment by attaching three exhibits to her response to the motion to dismiss. We disagree.

■ {41} In a breach of contract action, provisions that are integral to the contract may be attached to pleadings without converting the motion into one for summary judgment. *See Envtl. Control, Inc.*, 2002–NMCA–003, ¶¶ 5–7, 131 N.M. 450, 38 P.3d 891 (reviewing the dismissal of the plaintiff's complaint for breach of contract and breach of an implied covenant of good faith and fair dealing based upon a prior settlement agreement between the parties which was attached to the complaint as an exhibit); *Goodman*, 135 F.Supp.2d at 46–47 (recognizing that the attachment of the honor code and student handbook to a motion to dismiss the student's claims for breach of contract and civil rights violations did not convert the motion into one for summary judgment because such documents were central to the plaintiff's allegations of a contractual relationship). Plaintiff's breach of contract and breach of implied contract claims are dependent on the terms of the Scholarship Agreements and the Student Handbook. Therefore, these documents effectively merge into the pleadings and can be reviewed in deciding a motion to dismiss. *See Envtl. Control, Inc.*, 2002–NMCA–003, ¶¶ 6–7, 131 N.M. 450, 38 P.3d 891; *Goodman*, 135 F.Supp.2d at 46–47.

{42} We are aware that Plaintiff also attached an affidavit to her response. However, review of the affidavit indicates that

Plaintiff was only seeking to explain her inability to obtain a copy of her most recent Scholarship Agreement. The district court could rely on the two Scholarship Agreements that were attached and thus had no need to rely on Plaintiff's affidavit in rendering its decision. Therefore, Plaintiff's attachment of the affidavit did not convert the motion into one for summary judgment.

{43} We also disagree that Plaintiff's conclusory request for summary judgment in her response to the motion to dismiss indicates that Plaintiff intended to convert Defendants' motion into one for summary judgment. *See Dunn v. McFeeley,* 1999–NMCA–084, ¶ 13, 127 N.M. 513, 984 P.2d 760 (observing that "we can see no incentive for a plaintiff opposing dismissal to try to convert the proceeding to a hearing on a motion for summary judgment"). We note that Plaintiff was seeking to amend her complaint and to depose the individual Defendants. This suggests that Plaintiff intended to conduct additional discovery before making a dispositive motion. If Plaintiff had been treating the motion as one for summary judgment, she would have, in all likelihood, opposed Defendants' request for a protective order. Based upon our holding that the complaint was properly dismissed on the pleadings, Plaintiff's contentions as to discovery need not be addressed. *See id.* ¶ 17.

## CONCLUSION

{44} For the reasons set forth above, we affirm the trial court's order dismissing Plaintiff's complaint and the denial of Plaintiff's motion to amend. We also affirm the district court's amended order stating that the motion was not converted into one for summary judgment.

{45} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and RODERICK T. KENNEDY, Judges.