# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>July 26, 2017</u>

**NO. 35,251**

**AMY AVALOS, CHELSIE CARTER, SHELBY HUGHES, MARCELLA MADRID, MARGARITA MELENDEZ, FRANCINE SIMMS, JEAN SMITH, and ANGELA CAVENDER, on behalf of themselves and all others similarly situated,**

Plaintiffs-Appellees,

v.

**THE BOARD OF REGENTS OF NEW MEXICO STATE UNIVERSITY, in its capacity as the body politic for NEW MEXICO STATE UNIVERSITY and DOÑA ANA COMMUNITY COLLEGE,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Jerry H. Ritter Jr., District Judge**

Treinen Law Office PC
Rob Treinen
Albuquerque, NM

Almanzar & Youngers PA
Joleen K. Youngers
Las Cruces, NM

The Pickett Law Firm LLC
Lawrence M. Pickett
Las Cruces, NM

for Appellees

Miller Stratvert P.A.
Cody R. Rogers
Luke A. Salganek
Las Cruces, NM

for Appellant

**_____OPINION_**

**SUTIN, Judge.**

{1}     Plaintiffs are a group of former students who were enrolled in Doña Ana Community College's associate's degree nursing program (the program) in 2012. When Plaintiffs enrolled in the program, written documents provided by the Doña Ana Community College stated that the program was nationally accredited by, among others, the National League of Nursing Accrediting Commission (the Commission). Before the students completed their studies, the Doña Ana Community College lost its Commission accreditation and Plaintiffs sued. They brought an action that included a claim for breach of contract against the Board of Regents of New Mexico State University in its capacity as the body politic for the university and Doña Ana Community College (collectively, Defendant).[1] Defendant sought summary judgment as to Plaintiffs' breach of contract claim, arguing that it was immune under NMSA 1978, Section 37-1-23(A) (1976), because Plaintiffs' claim was not based on a "valid written contract." The district court denied Defendant's motion for summary judgment, Defendant filed a petition for writ of error, and this Court granted the petition to review Defendant's immunity claim. *See Handmaker v. Henney*, 1999-

---

[1] Plaintiffs also filed claims for breach of the covenant of good faith and fair dealing, promissory estoppel, and declaratory and injunctive relief. Those claims were voluntarily abandoned and are not before us.

NMSC-043, ¶¶ 14-15, 128 N.M. 328, 992 P.2d 879 (stating that determinations of immunity under Section 37-1-23(A) can, in general, be reviewed by writ of error). We hold that the written documents regarding accreditation relied upon by Plaintiffs do not constitute a valid written contract under Section 37-1-23(A).

**DISCUSSION**

{2}    Plaintiffs' breach of contract claim alleged that "[a] written agreement existed between Plaintiffs . . . and [Defendant] . . . whereby [Defendant] agreed that it would provide a nationally accredited education in nursing in exchange for [Plaintiffs'] enrollment and tuition." Plaintiffs asserted that they entered into a valid written contract with Defendant for a nationally accredited nursing program as evidenced by (1) the offer letter that they received from Defendant that offered admission to the program and required a written response accepting or declining a position in the program; (2) a student handbook that included a statement that information about accreditation of the program could be obtained from the Commission and included a ledger that stated, in relevant part, that the program was accredited by the Commission; and (3) a student handbook acknowledgment form that Plaintiffs were required to sign.

{3}    Section 37-1-23(A) states that "[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract."

2

Underlying the Section 37-1-23(A) grant of immunity is an overarching policy to "protect the public purse" by requiring that "parties seeking recovery from the state for benefits conferred on it have valid written contracts[.]" *Hydro Conduit Corp. v. Kemble*, 1990-NMSC-061, ¶ 23, 110 N.M. 173, 793 P.2d 855 (internal quotation marks omitted). This Court has determined that "[b]y limiting lawsuits to valid written contracts, the [L]egislature placed the risk of loss on a party who transacts business with a governmental entity without a valid written contract." *Campos de Suenos, Ltd. v. Cty. of Bernalillo*, 2001-NMCA-043, ¶ 14, 130 N.M. 563, 28 P.3d 1104. Our standard of review is de novo. *See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.*, 2005-NMSC-030, ¶ 8, 138 N.M. 360, 120 P.3d 442; *see also Ruegsegger v. Bd. of Regents of W. N.M. Univ.*, 2007-NMCA-030, ¶ 22, 141 N.M. 306, 154 P.3d 681 ("We apply a de novo review to the application of Section 37-1-23(A) to the facts[.]").

{4}     The parties discuss several cases in which our appellate courts have considered the application of Section 37-1-23(A). We discuss these cases for legal background relating to the issue at hand.

{5}     In *Garcia v. Middle Rio Grande Conservancy District*, 1996-NMSC-029, 121 N.M. 728, 918 P.2d 7, our Supreme Court considered whether a personnel policy that set forth "certain rights, expectations, obligations, and other promises between the

[employer] and its employees" constituted a valid written contract such that the plaintiff's governmental employer could be held liable for breach of an employment contract. *Id.* ¶¶ 1, 3. The plaintiff sued for breach of an employment contract after he was demoted, which resulted in a reduction in pay. *Id.* ¶¶ 1-2. In analyzing the case, our Supreme Court first noted that although an employment contract for an indefinite period of time is terminable at will, New Mexico recognizes implied contracts as an exception to the at-will rule. *Id.* ¶ 10. The Court determined that the employer's personnel policy contained "provisions relating to most every aspect of an employment relationship, including job description, compensation (including salary on promotion, demotion, or transfer), overtime, compensatory time, time clock violations, tardiness, sick leave and annual leave, and holidays." *Id.* ¶ 12. And the Court recognized that the policy was part of an implied employment contract because "it controlled the employer-employee relationship and [the plaintiff] could reasonably expect [the] employer to conform to the procedures it outline[d]." *Id.* ¶¶ 11-13 (internal quotation marks and citation omitted). The Court then held that, under the particular facts of *Garcia*, the implied employment contract, which was based on terms set forth in a personnel policy, constituted a "valid written contract[,]" and thus immunity was waived for such claims under Section 37-1-23(A). *Garcia*, 1996-NMSC-029, ¶¶ 14, 20 (internal quotation marks omitted).

{6} In *Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 1, 120 N.M. 680, 905 P.2d 718, the plaintiffs sued the defendant for breach of contract after the plaintiffs' child was injured at the defendant's day camp. Our Supreme Court considered whether the breach of contract claim based on the plaintiffs' written application to the day camp was a valid written contract that waived governmental immunity under Section 37-1-23(A). *Espinoza*, 1995-NMSC-070, ¶¶ 1, 15. Ultimately, the Court rejected the claim, stating that the town "did not undertake a contractual obligation for liability in the event of injury to a child attending its . . . day camp[,]" and "[a]t most, the terms of the application merely ensured that space would be provided in the day camp program for children who registered and paid the applicable fee." *Id.* ¶ 15.

{7} In *Ruegsegger*, 2007-NMCA-030, ¶¶ 4, 17, 21-22, this Court considered whether athletic scholarship agreements and a student handbook created a valid written contract under Section 37-1-23(A) between the defendants and the plaintiff. In *Ruegsegger*, the plaintiff filed a breach of contract claim against the defendants after she was allegedly raped by two school-affiliated athletes. 2007-NMCA-030, ¶ 2. According to the plaintiff, the defendants "breached their contractual obligations by deliberately failing to follow . . . policies and procedures in investigating the sexual attack, failing to provide a school free from harassment and hostility, and failing to provide reasonable support for [the plaintiff] following the assault." *Id.* The plaintiff

5

was a student athlete and claimed that her athletic scholarship agreements constituted an enforceable, written contract and that she had an implied contract based on the student handbook. *Id.* ¶ 4. Specifically, the plaintiff highlighted the defendants' failure to assemble a crisis intervention team as required by the student handbook and alleged that the defendants subjected the plaintiff "to humiliation and unfair treatment by deliberately failing to follow . . . policies and procedures after the rape" and failed to "provide reasonable support following the assault." *Id.* ¶ 14 (internal quotation marks omitted).

{8} In *Ruegsegger*, this Court first analyzed the scholarship agreements and held that the scholarship agreements required the plaintiff to maintain acceptable academic performance, play basketball, and comply with university regulations, and in exchange, the university was obligated to provide the plaintiff with scholarship assistance for her education. *Id.* ¶ 19. According to this Court, the scholarship agreements made "no reference to any duty on the part of [the university] to comply with any . . . regulations or to investigate claims of harassment, sexual assaults, or any other misbehavior by other students[,]" and thus, the agreements could not form the basis for the plaintiff's breach of contract claim. *Id.* ¶¶ 18-20.

{9} The *Ruegsegger* Court next analyzed the provisions in the student handbook to determine whether there was a claim for breach of implied contract. *Id.* ¶¶ 21-37.

6

In analyzing the handbook, this Court assumed without deciding that Section 37-1-23(A) did not bar the plaintiff's claim and ultimately held that the plaintiff "failed to state a valid claim for breach of contract based upon the language of the [s]tudent [h]andbook." *Ruegsegger*, 2007-NMCA-030, ¶ 22. We noted that "[t]o establish a claim for breach of implied contract based upon the terms of the [s]tudent [h]andbook, [the p]laintiff was required to demonstrate that those terms created a reasonable expectation of contractual rights. The reasonableness of the [plaintiff's] expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue." *Id.* ¶ 24 (citation omitted).

{10}    The handbook in *Ruegsegger* contained:

> (1) a student code of conduct and sanctions that [could] be imposed against a student who violate[d] the code, (2) a description of academic standards and procedures that [would] be used when considering the imposition of sanctions for poor academic performance and appeal of those sanctions, (3) a provision for a disciplinary committee that [would] hear[] cases involving student discipline without specifying the type of hearings that should be conducted except to recognize a student's right to due process, (4) a drug and alcohol policy with specified procedures for any student who violate[d] the policy, and (5) a general nondiscrimination policy.

*Id.* ¶ 25. It also contained a section regarding the student appeals committee, a sexual harassment policy, and a section titled "response to an alleged sexual assault," which outlined a procedure for the university regarding its response to sexual assault allegations. *Id.* ¶¶ 26-28.

7

{11}     The *Ruegsegger* Court held that the provisions in the handbook did not contractually guarantee rights to specific types of investigations, support, and sanctions in the event of a sexual assault, but rather provided guidelines. *Id.* ¶¶ 30, 33. The Court acknowledged that the plaintiff had cited to a number of cases in which courts across the country have held that the relationship between students and post-secondary educational institutions is contractual, but differentiated those cases from *Ruegsegger* on the ground that those cases involved claims by students that the institution had "breached promises relat[ed] to academic matters or access to educational programs." *Id.* ¶ 32. This Court stated that "[n]one of the cases cited by [the p]laintiff support[ed] her conclusion that, merely because there is a contractual relationship between a university and a student, the university is contractually bound to honor every provision found in a student handbook." *Id.* ¶ 33. In dismissing the plaintiff's breach of contract claim on the basis that it was unreasonable for the plaintiff to expect that the university had promised services, this Court rejected the plaintiff's claim that dismissal entitled students to less contractual protection and stated that "dismissal only indicate[d] that students' contractual protections, absent explicit language to the contrary, will be confined to the scope of their academic relationship with an educational facility." *Id.* ¶¶ 33, 36.

{12}     In *Campos de Suenos*, 2001-NMCA-043, ¶ 1, this Court considered whether to expand the analytical framework of *Garcia*, which allowed implied-in-fact contracts to be considered valid written contracts, outside of the employment context. In *Campos de Suenos*, the plaintiff began negotiating with the defendant for the sale of a ballpark. *Id.* ¶¶ 2-3. At a public meeting, members of the defendant's commission voted in favor of purchasing the ballpark. *Id.* ¶ 3. However, in the months following that meeting, the parties were unable to negotiate a proposed sales agreement and no written contract was ever executed by the parties. *Id.* Eventually the defendant decided not to move forward with the purchase. *Id.* Although the parties never entered into an express written contract for the sale of the complex, the plaintiff offered "a slew of partial writings as evidence of its contract with the [defendant]." *Id.* ¶¶ 18, 20. Specifically, the plaintiff pointed to "transcripts of meetings, staff summaries, and the like[.]" *Id.* ¶ 23. This Court held that allowing the plaintiff to "cobble together a contract in such a manner undermine[d] the purpose of having a comprehensive document," i.e., "a valid written contract" as required in Section 37-1-23(A). *Campos de Suenos*, 2001-NMCA-043, ¶ 18. We expressed "grave reservations with the proposition that *Garcia* allows implied-in-fact contracts outside of the employment context to override governmental immunity." *Campos de Suenos*, 2001-NMCA-043, ¶ 26. Accordingly, we stated, "Given the particular nature of

9

employment law, we decline to expand the Supreme Court's holding in *Garcia*, beyond the employment arena." *Campos de Suenos*, 2001-NMCA-043, ¶ 28.

{13}    In the case now before us, Plaintiffs recognize that "[o]rdinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Garcia*, 1996-NMSC-029, ¶ 9 (internal quotation marks and citation omitted). They argue that a contractual offer and acceptance is evidenced by the offer letter and the representation that the education provided would be a nationally accredited nursing education as evidenced by statements in the handbook and supported by the handbook acknowledgment form. Plaintiffs assert that whether the statement in the handbook regarding accreditation is sufficient to allow a breach of contract claim does not impact contract formation but rather impacts only breach of contract and contract interpretation, and therefore Section 37-1-23(A) immunity is not implicated. Plaintiffs also argue that Defendant's representation of accreditation in the handbook is definite, specific, or explicit as required by *Ruegsegger*. *See* 2007-NMCA-030, ¶ 24. According to Plaintiffs, the facts in this case are distinguishable from *Ruegsegger* because national accreditation is a "core academic matter[,]" and thus "[i]t is entirely within students' and higher education institutions' objectively reasonable expectations to believe that when an institution

10

says its program is nationally accredited, it will deliver a nationally accredited education."

{14} We begin by noting our disagreement with Plaintiffs' assertion that Defendant's Section 37-1-23 arguments implicate breach of contract and contract interpretation rather than contract formation and therefore should be considered by a jury. We are asked to determine whether there was a valid written contract that contractually obligated Defendant to provide a nationally accredited education to Plaintiffs, an issue that squarely involves contract formation and requires this Court to determine, as a matter of law, whether immunity is waived. *See Univ. of N.M. Police Officer's Ass'n*, 2005-NMSC-030, ¶ 8 (stating that "[i]n analyzing the application of [Section 37-1-23(A)] to the facts . . . , [the appellate courts] are faced with a question of law"); *Ruegsegger*, 2007-NMCA-030, ¶ 22 (analyzing, as a matter of law, "the application of Section 37-1-23(A) to the facts").

{15} We hold that the offer letter, the handbook, and the handbook acknowledgment form do not constitute a valid written contract under Section 37-1-23(A) that contractually obligated Defendant to provide a nationally accredited education to Plaintiffs. We address the documents in turn.

{16} The offer letter—which Plaintiffs argue evidences offer and acceptance—does not mention accreditation, the handbook, or the handbook acknowledgment form. The

11

offer letter is similar to the application to the day camp in *Espinoza* and the scholarship agreements in *Ruegsegger*. In both cases, the appellate courts rejected the plaintiffs' respective breach of contract claims because the writings, at best, created contracts that were not implicated by the plaintiffs' particular breach of contract claim. *See Espinoza*, 1995-NMSC-070, ¶ 15 (holding that the defendant "did not undertake contractual obligation for liability" for damages by virtue of the plaintiffs' day camp application because the language in the application simply ensured space in the program); *Ruegsegger*, 2007-NMCA-030, ¶¶ 18-20 (holding that the scholarship agreements could not form the basis of the plaintiff's breach of contract claim because those agreements did not obligate the defendants to investigate sexual assault claims but rather simply required the plaintiff to maintain acceptable academic performance, play basketball, and comply with regulations, and in exchange, the defendants were obligated to provide the plaintiff with scholarship assistance). Here, the offer letter, at best, evidences an agreement that Plaintiffs would or intended to enroll in the program. It does not, however, evidence an agreement to provide a nationally accredited education.

{17}   We also reject Plaintiffs' argument that there exists a contract sufficient to waive immunity because it was reasonable for Plaintiffs to expect contractual rights based on the handbook and the handbook acknowledgment form. *See id.* ¶ 24.

12

Although Plaintiffs argue that "nothing need be implied to show there exists a written contract that the education to be provided will be a nationally accredited education[,]" this "reasonableness" argument is an implied contract argument similar to the argument made in *Ruegsegger*. *See id.* ¶¶ 4, 22 (construing the plaintiff's breach of contract argument based on the student handbook as an implied contract argument).[2] As noted earlier, in *Ruegsegger*, we held that, based on the language in the student handbook, the plaintiff could not reasonably expect that the defendants would be obligated to perform a comprehensive investigation and provide her with more support after she disclosed the alleged assault to officials. 2007-NMCA-030, ¶¶ 24, 30. And although we suggested that the outcome of the implied contract analysis in *Ruegsegger* might be different in cases involving academic matters, we noted that the inquiry would center on what was reasonable. *Id.* ¶¶ 32-33.[3]

---

[2] In *Ruegsegger*, this Court did not outright reject the proposition that an implied contract based on a student handbook could meet the requirements of Section 37-1-23(A); however, we also did not explicitly expand our Supreme Court's holding in *Garcia* such that implied contracts may always constitute valid written contracts beyond the employment arena. *See Ruegsegger*, 2007-NMCA-030, ¶ 22 (assuming without deciding that Section 37-1-23(A) did not bar the plaintiff's claim).

[3] *Ruegsegger* did not clarify whether it is appropriate to construe an implied contract as a valid written contract as contemplated by Section 37-1-23(A) outside of the employment arena. In *Campos de Suenos*, 2001-NMCA-043, ¶¶ 18, 26, this Court expressed "grave reservations" with expanding our Supreme Court's holding in *Garcia* to non-employment cases and with allowing a plaintiff to "cobble together a contract" in an attempt to satisfy the requirements of Section 37-1-23(A).

13

{18} In this case, as in *Ruegsegger*, we are not persuaded that an implied contract exists based on the handbook or other writings that would waive immunity under Section 37-1-23(A). Implied contract claims require proof that the promise or representation must be definite, specific, or explicit so that there is "a reasonable expectation of contractual rights." *Ruegsegger*, 2007-NMCA-030, ¶ 24; *see Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 14, 115 N.M. 665, 857 P.2d 776 (same). In this case, there is no representation or promissory language in any of the writings that Defendant "promise[s] it will be accredited" or is obligated to obtain or maintain national accreditation. The general, non-promissory accreditation language here is insufficiently definite, specific, or explicit to give rise to a reasonable expectation of *contractual rights* regarding national accreditation. *See Ruegsegger*, 2007-NMCA-030, ¶¶ 30, 33 (holding that the provisions in the student handbook provided guidelines rather than contractually guaranteeing a right, that it was unreasonable for the plaintiff to expect that the defendants promised support following a sexual assault, and that the provisions in the handbook did not constitute the terms of an implied contract); *see also Sanchez v. The New Mexican*, 1987-NMSC-059, ¶ 12, 106 N.M. 76, 738 P.2d 1321 (affirming the dismissal of an implied contract claim on grounds that "the handbook lacked specific contractual terms which might evidence the intent to form a contract" and that "[t]he language is of a

14

non-promissory nature and merely a declaration of [the] defendant's general approach"); *Stieber v. Journal Publ'g Co.*, 1995-NMCA-068, ¶ 13, 120 N.M. 270, 901 P.2d 201 ("General policy statements of a non-promissory nature contained in an employee handbook are insufficient to create an implied contract."). As in *Ruegsegger*, Plaintiffs have not demonstrated that the terms in the handbook or other writings created a reasonable expectation of contractual rights in continued accreditation, even though accreditation may be academic in nature. Therefore, we hold that there is no implied contract sufficient to waive immunity pursuant to Section 37-1-23(A).

{19} Plaintiffs' assertion that the offer letter can and should be read in tandem with the handbook and the handbook acknowledgment form does not alter our holding. As stated earlier, the documents are insufficient to create a valid written contract on their own, and our conclusion that there is no valid written contract for Defendant to provide Plaintiffs with a nationally accredited education is not altered merely by reading the multiple, insufficient documents together. Moreover, although a contract can consist of several related writings, *see Crow v. Capitol Bankers Life Ins. Co.*, 1995-NMSC-018, ¶ 29, 119 N.M. 452, 891 P.2d 1206, we reiterate our concern that allowing Plaintiffs to "cobble together a contract in such a manner [would] undermine[] the purpose of having a comprehensive document," i.e., "a valid written

contract" as required in Section 37-1-23(A). *See Campos de Suenos*, 2001-NMCA-043, ¶ 18.

**CONCLUSION**

{20}    As to Plaintiffs' contract claims, Defendant is immune under Section 37-1-23(A). We reverse and remand with instructions to enter summary judgment in favor of Defendant.

{21}    **IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**


_____
**LINDA M. VANZI, Chief Judge**


_____
**JULIE J. VARGAS, Judge**

16